## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

**JASON SALTZ**

          Plaintiff

**v.**

**CITY OF FREDERICK, MARYLAND**

**EDWARD HARGIS**

**DWIGHT SOMMERS**

**JOHN S. CORBETT**

and

**TRACEY WILES**

        Defendants

Civil Action No.:

20-cv-00831-ELH

---

## <u>AMENDED COMPLAINT</u>
– § 1983 Claims for Damages and for Declaratory and Injunctive Relief –
– With Jury Demand –

---

Jason Saltz, Plaintiff, by and through counsel, Sean R. Day,

respectfully files this amended complaint and states:

## TABLE OF CONTENTS

Jurisdiction and Venue ........................................................................................ 3

Parties ..................................................................................................................... 3

First Amendment Activities ................................................................................ 4

Policymakers .......................................................................................................... 5

Policies .................................................................................................................... 6

Police Actions on November 2 and 9, 2019 ..................................................... 9

Additional Specifics Regarding Defendant Officers ...................................... 11

Failure to Train and Custom .............................................................................. 15

Lack of Effort at Less Restrictive Means ......................................................... 17

Impact .................................................................................................................... 18

Count 1 — § 1983 Claim for Damages Against Municipality for 11/2/19 ....... 18

Count 2 — § 1983 Claim for Damages Against Individuals for 11/2/19 .......... 19

Count 3 — § 1983 Claim for Damages Against Municipality for 11/9/19 ...... 20

Count 4 — § 1983 Claim for Damages Against Individuals for 11/9/19 ......... 22

Count 5 — Declaratory and Injunctive Relief ................................................. 23

REQUEST FOR RELIEF .................................................................................. 25

DEMAND FOR JURY TRIAL ....................................................................... 26

## Jurisdiction and Venue

**1.**      This complaint contains claims under 42 U.S.C. § 1983 pertaining to

the Plaintiff's First Amendment rights, applicable to the Defendants

through the Fourteenth Amendment. The Court has original jurisdiction

pursuant to 28 U.S.C. § 1331.

**2.**      All events herein occurred within the City of Frederick, Maryland.

## Parties

**3.**      Plaintiff **Jason Saltz** is a natural person and citizen of the

Commonwealth of Virginia and the United States of America.

**4.**      Defendant **City of Frederick, Maryland**, is a local municipal

corporation located in the State of Maryland and is a "person" under 42

U.S.C. § 1983; the City of Frederick Police Department is an agency thereof.

**5.**      During all events described herein, Defendant **Edward Hargis** was

the police chief of the City of Frederick Police Department acting within

the scope of that employment and under the color of state and municipal

law. Hargis is sued in his individual capacity.

**6.**      During all events described herein, the following persons were

officers with the City of Frederick Police Department acting within the

scope of that employment and under the color of state and municipal law,

and are sued in their individual capacities (indicating position during

incidents herein): **Dwight Sommers** (captain); **John S. Corbett**

(lieutenant); and **Tracey Wiles** (sergeant). Sommers was the immediate

supervisor of Corbett and Wiles at the relevant times herein.

### First Amendment Activities

**7.**    This litigation relates to activities on November 2 and 9, 2019, and to

planned activities in November and December 2020.

**8.**    In November and December of each year a third party operates

horse-drawn carriage rides in the City of Frederick, picking up and

dropping off riders standing in line; for the activities relevant herein, pick-

up and drop-off were on the block of 300-320 East Church Street,

Frederick, Maryland.

**9.**    Saltz is an animal rights advocate and activist who desired and

desires to protest and leaflet against the use of horses to pull carriages.

**10.**    The activities herein occurred in a commercial area at times when

there is substantial ambient noise.

**11.**    At each event no more than twenty animal rights protesters

appeared for protests against the horse drawn carriages.

**12.**    Protesters, including Saltz, desired to stand on the opposite side of the street on a public sidewalk and space, hold signs protesting the horse drawn carriages, and at times chant or yell against horse-drawn carriages.

**13.**    Additionally, at times one or two persons, including Saltz, desired to offer leaflets at arm's reach and engage in civil discussion at a conversational distance with persons waiting to ride the carriages (**potential riders**), to peacefully and politely try to persuade them not to ride in horse drawn carriages or to consider not doing so again. This cannot be done effectively from a distance such as from across the street.

**14.**    Saltz along with others has participated in the protest events in 2018 and 2019 and intends to do so again in 2020. Other persons without Saltz protested in 2017.

## Policymakers

**15.**    In reference to police policies and training including the policies and training herein, Hargis and prior police chiefs were policymakers and final decisionmakers for the City of Frederick.

**16.**    The City of Frederick, through Hargis and the prior police chief,

implemented, ratified, and approved policies regarding protesters and leafletters. These policies included but were not limited to the policies referenced herein.

17.     The City of Frederick, through Hargis and the prior police chief, designed, implemented, and supervised the deficient training policies herein.

## Policies

18.     **Municipal Policy**: Frederick Police Department General Order 701, "First Amendment Rights" (**General Order**), approved October 1, 2012.

19.     **Municipal Policy**: Frederick Police Department "Operations Plan [for] Horse Drawn Carriage Rides November 2019" (**Operations Plan**), approved October 31, 2019.

20.     The General Order was obviously deficient in guiding officers on basic concepts and commonly-occurring situations. For instance, the General Order was issued before and therefore did not address common and fundamental concepts addressed in *McCullen v. Coakley*, 573 U.S. 464, 134 S. Ct. 2518 (2014) (leafletting vs. protesting), and *Reed v. Town of Gilbert*, 576 U.S. 155, 163, 135 S. Ct. 2218, 2226 (2015) (content neutrality). (In fact

these were still not addressed in the version of the General Order

approved December 3, 2019).

21.    The General Order did not even address a common and

fundamental issue in the decades old case of *Eanes v. State*, 318 Md. 436,

569 A.2d 604 (1990), which held that police may not arrest protesters for

making unreasonably loud noises unless (a) there is a citizen-initiated

complaint and (2) the noise is objectively unreasonable under the totality

of circumstances. (This is not in the December 3, 2019 version either.)

22.    The General Order primarily focuses on vague generalities and

uninstructive statements such as "Police [officers] will treat all persons

asserting [First Amendment rights] lawfully" and "picketers are permitted

to distribute informational leaflets and/or pamphlets."

23.    The General Order does not inform officers that leafletters differ

from protesters and should be permitted to be within arm's reach and

conversation distance to engage in civil discourse and offer a leaflet.

24.    The General Order does not inform officers that protesters and

leafletters should be able to engage with people who might disagree with

them and that restricting speech based on the reaction of others makes the

restrictions content or even viewpoint based.

25.     The Operations Plan was implemented for "Protesting Group: Frederick Vegan Army." ("Frederick Vegan Army" was an informal name used by protest organizers in 2018 but not in 2019).

26.      Like the General Order, the Operations Plan was grossly deficient. It wholly failed to guide officers on basic concepts and commonly-occurring situations (*e.g.*, leafletting, content-neutrality, unreasonably loud noise) and only contained uninstructive generalities such as "provide public safety," "respond to unlawful tactics," "professionalism will be maintained," and "it is the intention of the FPD to allow the group to exercise their 1st amendment right to free speech."

27.     The Operations Plan directed the assigned supervisor at the scene to set up a designated area for "the protest group," *i.e.*, those protesting against the horse-drawn carriage rides, identified in the Plan as the "Frederick Vegan Army."

28.     The Operations Plan instructed that "protesters are not to go beyond the corner of the building at 'The Lerner Collection' on E. Church Street. This is to ensure adequate space between the groups." In context,

the other "group" meant riders and potential riders.

**29.**     The Operations Plan prohibited "the protest group," *i.e.*, those against the carriage rides, from using the sidewalk across the street from the riders and potential riders.

**30.**     The policies herein were reckless and obviously deficient in their failures to address basic, well-known, and commonly-occurring First Amendment situations addressed in prominent caselaw, such as leafletting, content-based issues, and chanting/yelling. These obvious omissions were substantially likely to result in the deprivation of First Amendment rights and amounted to deliberate indifference toward the First Amendment rights of citizens.

**31.**     Failure to train and custom are discussed later.

### Police Actions on November 2 and 9, 2019

**32.**     In 2019 the City of Frederick and its police officers, pursuant to the Operations Plan, set up a "First Amendment Area" at the southeast corner of North East Street and East Church Street, which was substantially out of sight and sound of riders/potential riders (20-50) and the carriage operators. Protesters in the "First Amendment Area" would only be in

sight and sound riders after they had already taken a ride on the carriage.

33.     Protesters, including Saltz on November 2 and 9, 2019, were allowed to stand across the street from riders/potential riders and the carriage operators (outside the "First Amendment Area") but with the following conditions:

    **a.**     They had to stand at the far end of the sidewalk (from the street) without letting their feet touch the abutting grass (even though also part of public space); having feet touch the grass caused them to be subjected to harassment and threats by police officers.

    **b.**     They could not chant or yell; more specifically, as informed by the totality of statements, circumstances, and context, they could not chant or yell a viewpoint opposing the horse drawn carriages.

34.     It was apparent from the comments and actions of Corbett (November 2) and Wiles (November 9) that the problem with chanting was the viewpoint of the speech and the potential negative reaction of riders, potential riders, and carriage operators. In that light, chanting and yelling were pre-emptively equated with disturbing the peace even without a citizen-initiated complaint and without an independent and objective determination that the noise was unreasonably loud under the

circumstances.

**35.**     There had not been a citizen-initiated complaint about the noise

level of chanting, and chanting would not have been unreasonably loud

under the circumstances.

**36.**     Leafletters, including Saltz on November 9, 2019, were not allowed

to approach potential riders to offer leaflets at arm's reach and engage in

civil discussions at conversational distance. Wiles told Saltz that he could

not leaflet because in her mind Saltz had a viewpoint that was opposed to

the viewpoints of the potential riders.

**37.**     All police officers at the scene including Corbett and Wiles allowed

others to disrupt protest activities, including but not limited to:

>     **a.**     Two large men working with the carriage operator would
>
>     walk up and down the sidewalk where the protesters were, back
>
>     and forth, to harass protesters and to attempt to create the
>
>     appearance that protesters were blocking the sidewalk.
>
>     **b.**     One person played loud music with a "boom box" set up
>
>     behind protesters to disrupt them.

## Additional Specifics Regarding Defendant Officers

**38.**    On November 2, 2019, Corbett, at the direction of Sommers, prohibited protesters, including Saltz, from chanting across the street from potential riders, for the stated reason that their viewpoints were opposed to horse drawn carriages and as a result the chanting would disturb the peace. There had not been a citizen-initiated complaint about the noise level, and the noise level would not have been unreasonably loud under the circumstances.

**39.**    For instance, Corbett said —

    **a.**    Protesters could be as loud as the wanted to be in the designated area, but across the street from riders/potential riders and the carriage operators any chanting against the carriage rides was *per se* unreasonably loud (the two areas were near one another; the difference was that the area where chanting was prohibited was across the street from riders, potential riders, and the carriage operators).

    **b.**    That the loud outdoor music from a third party was not disturbing the peace.

    **c.**    That if any counter-protesters showed up (none did), counter-protesters could freely use the area in which protesters were prohibited from chanting.

**40.**    On November 9, 2019, Wiles, at the direction of Sommers, prohibited protesters, including Saltz, from chanting across the street from potential riders, for the stated reason that their viewpoints were opposed to horse drawn carriages and as a result the chanting would disturb the peace. There had not been a citizen-initiated complaint about the noise level, and the noise level would not have been unreasonably loud under the circumstances. On this day a boom box was permitted to play loud music behind the protesters, intended to annoy and disrupt the protesters.

**41.**    Regarding chanting, Wiles said "You are provided that safe area up there. Shouting outside of that is disorderly or harassment." Wiles also stated that the carriage operators would feel harassed by shouting outside the designated area; this was due to the viewpoint of the protests.

**42.**    On November 9, 2019, Wiles initially advised protesters, including Saltz, that they could chant, but returned to state that at the direction of her captain (Sommers) that chanting was not allowed: "[The captain] advised me that the area up there is your protected First Amendment

space. ... I am giving the order, from the captain, through me, you are being afforded your First Amendment rights in the designated area."

43.     Also on November 9, 2019, Wiles, at the direction of Sommers, prohibited Saltz from approaching potential riders to offer a leaflet at arm's reach and to speak with them at a conversational distance. Wiles stated that the reason was that the potential riders had viewpoints opposed to Saltz's.

44.     Wiles initially told Saltz he could approach to speak with and offer leaflets to potential riders. Wiles apparently misunderstood the request and believed Saltz intended to approach persons who were not potential riders and who therefore did not, in her mind, have the opposite viewpoint. When Wiles realized that Saltz intended to speak with and offer leaflets to potential riders, she blocked him and informed him he could not offer leaflets to or speak with people with opposing viewpoints

45.     Regarding leafletting, Wiles said "I'm not going to allow you within the group that has opposing views."

46.     If it was not explicitly stated, the totality of statements, actions, demeanor, and context made it apparent that the restrictions were viewpoint based.

## Failure to Train and Custom

**47.**     As set forth above, the General Order and the Operations Plan, and other training programs, were reckless or deliberately indifferent in training officers in basic, well-known, and commonly-occurring First Amendment situations addressed in prominent caselaw, such as leafletting, oppositional speech, and/or loud speech, such that constitutional violations were substantially certain to occur. Failing to correct these obvious training deficiencies amounted to deliberate indifference toward the constitutional rights of citizens.

**48.**     Even the commanding officers at the scene and as designated in the Operations Plan, Lt. Corbett (November 2) and Sgt. Wiles (November 9), as well as the top operations commander, Capt. Sommers, were left uneducated and ill-prepared regarding these basic, well-known, and commonly-occurring First Amendment situations addressed in prominent caselaw, as displayed in videorecordings from the events herein.

**49.**     All police officers at the scene (typically from four to twelve police officers each event) including commanding supervisors (Corbett on November 2 and Wiles on November 9, as supervised by Sommers) engaged in coordinated, uniform, and widespread actions that created a

custom regarding protesters and leafletters. Sommers upon information and belief had top operational command remotely and was aware of the situations on the ground.

50.     That Hargis failed to update the General Order following *McCullen* and *Reed* was part of a widespread and pervasive failure to train and culture and custom of deliberate indifference toward the First Amendment rights of protesters and leafletters.

51.     That even the 2019 General Order failed to incorporate the principles in *McCullen* (2014) and *Reed* (2015), and continued to ignore *Eanes* (1990), evidences a widespread and pervasive failure to train and culture and custom of deliberate indifference toward the First Amendment rights of protesters and leafletters.

52.     The obviously deficient Operations Plan was further evidence of a widespread and pervasive failure to train and culture and custom of deliberate indifference toward the First Amendment rights of protesters and leafletters.

53.     The actions of top commanders were so stunningly brash and ignorant of the basic First Amendment rights of citizens (see, *e.g.*, section

below) that it is highly improbable that they became suddenly inept; rather, it was the result of a widespread and pervasive failure to train and custom of ineptitude and of violations of First Amendment rights of others.

54.    As it is highly improbable that all the actions and omissions herein occurred despite sufficient training and a custom of First Amendment adherence, but was more likely than not to have been part of a widespread and pervasive failure to train and a custom of deliberate indifference, pretrial discovery is expected to further demonstrate failure to train and a custom of deliberate indifference toward the First Amendment rights of protesters and leafletters.

## Lack of Effort at Less Restrictive Means

55.    There was no justification for the policies and customs herein. Furthermore, Hargis and the City of Frederick did not consider, much less attempt, less intrusive means that were available to address any perceived concerns.

## Impact

**56.**     Protesters and leafletters were threatened with arrest if they did not

follow the policies, customs, and actions set forth above.

**57.**     On November 2 and 9, 2019, Saltz wanted to chant across the street

from potential riders but did not do so due to the policies, customs, and

actions set forth herein.

**58.**     On November 9, 2019, Saltz wanted to approach potential riders at

arm's reach and conversational distance to offer leaflets and have civil

discussions in a conversational voice, but did not do so due to the policies,

customs, and actions set forth herein.

## Count 1 — § 1983 Claim for Damages Against Municipality for 11/2/19

**59.**     Paragraphs preceding Count 1 are incorporated herein by reference

as if fully set forth herein.

**60.**     This count is filed against the City of Frederick pursuant to 42 U.S.C.

§ 1983 for its unconstitutional policies, failure to train, and customs.

**61.**     On November 2, 2019, the City of Frederick's policies, failure to

train, and customs, including omissions in policy and training where the

need was obvious, caused the prohibition of chanting from across the

street and were the moving force behind the deprivation of Mr. Saltz's

First Amendment rights.

**62.**     On November 2, 2019, the City of Frederick's policies, failure to

train, and customs, including omissions in policy and training where the

need was obvious, caused the ban of chanting from across the street with

opposing viewpoints, or alternatively due to content, and were the

moving force behind deprivation of Mr. Saltz's First Amendment rights.

**63.**     As a direct and proximate result of these violations, Mr. Saltz

suffered a deprivation of constitutional rights.


### Count 2 — § 1983 Claim for Damages Against Individuals for 11/2/19

**64.**     Paragraphs preceding Count 1 are incorporated herein by reference

as if fully set forth herein.

**65.**     This count is filed pursuant to 42 U.S.C. § 1983 against Defendants

Edward Hargis (chief), Dwight Sommers (captain), and John S. Corbett in

their individual capacities.

**66.**     On November 2, 2019, Corbett prohibited Saltz from chanting across

the street from potential riders.

**67.**     On November 2, 2019, Corbett prohibited Saltz from chanting

opposing viewpoints across the street from potential riders.

**68.** Corbett's actions were at the express direction and authorization of his superiors Hargis and Sommers. In the alternative, if they did not expressly direct or authorize the actions, Hargis and Sommers knew that Corbett and other officers were taking the actions and the response or lack thereof with deliberate indifference encouraged, condoned, and acquiesced in the actions and caused the constitutional deprivations herein.

**69.** As a direct and proximate result of these violations, Mr. Saltz suffered a deprivation of constitutional rights.

## Count 3 — § 1983 Claim for Damages Against Municipality for 11/9/19

**70.** Paragraphs preceding Count 1 are incorporated herein by reference as if fully set forth herein.

**71.** This count is filed against the City of Frederick pursuant to 42 U.S.C. § 1983 for its unconstitutional policies and customs.

**72.** On November 9, 2019, the City of Frederick's policies, failure to train, and customs, including omissions in policy and training where the need was obvious, caused the prohibition of chanting from across the

street and were the moving force behind deprivation of Mr. Saltz's First Amendment rights.

73.     On November 9, 2019, the City of Frederick's policies, failure to train, and customs, including omissions in policy and training where the need was obvious, caused the prohibition of chanting from across the street with opposing viewpoints and were the moving force behind deprivation of Mr. Saltz's First Amendment rights.

74.     On November 9, 2019, the City of Frederick's policies, failure to train, and customs, including omissions in policy and training where the need was obvious, caused the prohibition of leafletting potential riders and were the moving force behind deprivation of Mr. Saltz's First Amendment rights.

75.     On November 9, 2019, the City of Frederick's policies, failure to train, and customs, including omissions in policy and training where the need was obvious, caused the prohibition of leafletting potential riders due to viewpoint and were the moving force behind deprivation of Mr. Saltz's First Amendment rights.

76.     As a direct and proximate result of these violations, Mr. Saltz suffered a deprivation of constitutional rights.

## Count 4 — § 1983 Claim for Damages Against Individuals for 11/9/19

77.     Paragraphs preceding Count 1 are incorporated herein by reference as if fully set forth herein.

78.     This count is filed pursuant to 42 U.S.C. § 1983 against Defendants Edward Hargis (chief), Dwight Sommers (captain), and Tracey Wiles in their individual capacities.

79.     On November 9, 2019, Wiles prohibited Saltz from chanting across the street from potential riders.

80.     On November 9, 2019, Wiles prohibited Saltz from leafletting potential riders (approaching within arm's length and conversation distance to offer a leaflet and engage in peaceful discourse).

81.     On November 9, 2019, Wiles prohibited Saltz from leafletting potential riders due to viewpoint.

82.     Wiles's actions were at the express direction and authorization of her superiors Hargis and Sommers. In the alternative, if they did not expressly direct or authorize the actions, Hargis and Sommers knew that Wiles and other officers were taking the actions andthe response or lack thereof with deliberate indifference encouraged, condoned, and acquiesced in the actions and caused the constitutional deprivations

herein.

**83.**     As a direct and proximate result of these violations, Mr. Saltz

suffered a deprivation of constitutional rights.

<u>**Count 5 — Declaratory and Injunctive Relief**</u>

**84.**     Paragraphs preceding Count 1 are incorporated herein by reference

as if fully set forth herein.

**85.**     The City of Frederick has policies and customs and its officers took

actions in violation of the First Amendment rights of persons, including

Saltz, who wished to protest against and leaflet at the annual November

and December horse drawn carriage activities.

**86.**     These policies, customs, and violations include:

 **a.**     Not allowing protesters to chant across the street from

 potential riders.

 **b.**     Not allowing protesters to chant across the street from

 potential riders due to perceived opposing viewpoints.

 **c.**     Not allowing leafletting of potential riders (approaching

 within arm's length and conversation distance to offer a leaflet and

 engage in peaceful discourse).

**d.**     Not allowing leafletting of potential riders due to viewpoint.

**87.**     Upon information and belief, there will continue to be horse drawn carriage rides in the City of Frederick in November and December 2020.

**88.**     On November 2 and 9, 2019, Saltz was prohibited from chanting across the street from potential riders and on November 9, 2019, was prohibited from leafletting potential riders.

**89.**     On November 2, 2019, the City of Frederick, Edward Hargis, Dwight Sommers, and John S. Corbett violated Jason Saltz's First Amendment rights.

**90.**     On November 9, 2019 City of Frederick, Edward Hargis, Dwight Sommers, and Tracey Wiles violated Jason Saltz's First Amendment rights.

**91.**     There is an actual controversy between the parties.

**92.**     It would be in the public interest for there to be declaratory relief to resolve these issues and protect the First Amendment rights of citizens.

**93.**     In November and December 2020, Saltz desires to chant across the street from potential riders and to leaflet potential riders.

**94.**     Without injunctive relief, Mr. Saltz risks further violation of his fundamental constitutional rights in November and December 2020.

## REQUEST FOR RELIEF

**WHEREFORE**, Plaintiff Jason Saltz requests judgment as follows for each violation.

1.    A.    Compensatory damages in an amount to be determined by a jury;

      B.    punitive damages as determined by a jury;

      C.    attorney's fees;

      D.    costs; and

      E.    post-judgment interest

against Defendants City of Frederick, Edward Hargis, Dwight Sommers, John S. Corbett, and Tracey Wiles, jointly and severally, and such other and further relief as may be appropriate.

**AND**

2.    Declaratory judgment that Jason Saltz's First Amendment rights were violated on November 2 and 9, 2019, and preliminary and final injunctive relief against the City of Frederick, Maryland, barring the actions complained of herein and implementing corrective actions. Plus an award of attorney's fees and costs, and such other and further relief as may be appropriate.

## DEMAND FOR JURY TRIAL

Plaintiff demands a trial by jury.

Respectfully submitted,

/s/Sean R. Day /s/
Sean R. Day (Bar No. 12831)
7474 Greenway Center Dr Ste 150
Greenbelt MD 20770-3524
301.220.2270 phone
301.220.2441 fax
*sean@dayincourt.net*
Attorney for Plaintiff

## CERTIFICATE OF SERVICE

I hereby certify that a copy of this document was served this filing date upon all parties through the ECF filing system. All parties are represented by counsel who are registered ECF users and have entered appearances in this case.

/s/ Sean R. Day /s/
Sean R. Day