IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

JASON SALTZ
 *Plaintiff*,

 v.             Civil Action No. ELH-20-0831

CITY OF FREDERICK, MD, *et al.*,
 *Defendants*

### MEMORANDUM OPINION

  This case concerns the alleged infringement of the right to protest against horse-drawn carriage rides in the downtown shopping district of the City of Frederick, Maryland (the "City" or "Frederick"). Claiming a violation of his rights under the First Amendment, plaintiff Jason Saltz, an "animal rights advocate and activist," filed suit under 42 U.S.C. § 1983 against the City and four City employees, in their individual capacities: Edward Hargis, then the Chief of the Frederick City Police Department ("FPD"); Captain ("Capt.") Dwight Sommers of the FPD; Lieutenant ("Lt.") John S. Corbett of the FPD; and Sergeant ("Sgt.") Tracey Wiles of the FPD. ECF 1 ("Complaint"); ECF 12 ("Amended Complaint").

  In particular, Saltz alleges that defendants violated his First Amendment rights during protests held on November 2 and November 9, 2019, because Saltz was not allowed to "chant or yell against horse-drawn carriages" from a position located directly across the street from the carriage loading zone. ECF 12, ¶ 12. Saltz also complains that his rights were infringed because he was not permitted to "offer leaflets at arm's reach and engage in civil discussion at a conversational distance with persons waiting" for carriage rides. *Id.* ¶ 13.  Instead, Saltz and other protesters were restricted to chanting in a designated area on a street corner approximately

100 feet away from the carriage riders and were only allowed to leaflet individuals as they were leaving the carriage rides.

The Amended Complaint contains five counts and seeks damages as well as equitable relief. Counts 1 and 3 lodge "*Monell*" claims against the City, alleging "unconstitutional policies, failure to train, and customs."  ECF 12, ¶ 60; *id.* ¶ 71; *see Monell v. New York City Dep't of Soc. Servs.*, 436 U.S. 658 (1978). Count 1 pertains to the events of November 2, 2019, and Count 3 concerns November 9, 2019.  Count 2 alleges that on November 2, 2019, Lt. Corbett "prohibited Saltz from chanting across the street from potential [horse-carriage] riders."  *Id.* ¶ 66.  According to plaintiff, Corbett acted "at the express direction and authorization" of Chief Hargis and Capt. Sommers.  *Id.* ¶ 68.   Count 4 alleges that Sgt. Wiles prohibited Saltz from chanting and leafletting at his desired location on November 9, 2019.  *Id.* ¶¶ 79, 80, 81.  And, plaintiff asserts that Wiles acted pursuant to "the express direction and authorization" of Chief Hargis and Capt. Sommers. *Id.* ¶ 82.  Count 5 brings a claim for declaratory and injunctive relief.[1]

Defendants have moved to dismiss under Fed. R. Civ. P. 12(b)(6) or, in the alternative, for summary judgment under Fed. R. Civ. P. 56. ECF 16. They have also moved to bifurcate the *Monell* claims, pursuant to Fed. R. Civ. P. 42(b).  The motion is supported by a memorandum (ECF 16-1) (collectively, the "Motion") and numerous exhibits, including video files of scenes from the protests. Plaintiff opposes the Motion (ECF 21, "Opposition") and has submitted multiple exhibits, including additional video files.  However, he does not oppose consideration of at least part of the Motion as one for summary judgment.  Defendants have replied. ECF 26.

No hearing is necessary to resolve the Motion.  *See* Local Rule 105.6.  For the reasons that follow, I shall construe the Motion (ECF 16) as one to dismiss with respect to the *Monell*

---

[1] Saltz is not currently seeking the relief he requested in Count 5.  ECF 21 at 53.

claims and as to the supervisory liability claims against Hargis and Sommers, and as one for summary judgment with regard to the claims against Wiles and Corbett.[2]  I shall grant the Motion in part and deny it in part. In particular, I shall deny the Motion as to Counts 2 and 4 as to defendants Sommers, Wiles, and Corbett. But, I shall grant the Motion as to Counts 2 and 4 with respect to Chief Hargis. I shall also grant the Motion as to the *Monell* claims in Counts 1 and 3 predicated on theories of custom and failure to train. But, I shall otherwise deny the Motion as to Counts 1 and 3. And, I shall grant the request to bifurcate the *Monell* claim.

## I.    Background[3]

### A.  General Order 701

Frederick Police Department General Order 701, entitled "FIRST AMENDMENT RIGHTS," was "approved" on October 1, 2012. ECF 12, ¶ 18; *see* ECF 21-1 (the "General

---

[2] As plaintiff notes, defendants do not clearly articulate that they are moving to dismiss the claims as to Hargis and Sommers.  But, they argue that the Amended Complaint fails to set forth facts sufficient to state a claim as to them. *See* ECF 21 at 45 (citing ECF 16-1 at 18). Thus, plaintiff construes defendants' argument as to Hargis and Sommers as a motion to dismiss. The Court shall do the same.

[3] Given the procedural posture of this case, I rely primarily on the allegations in the Amended Complaint and the relevant policy documents for the factual background concerning the policies and practices of the City. With respect to the incidents on November 2 and November 9, 2019, and the conduct of the individual defendants, I consider the exhibits submitted with the Motion and the Opposition.

Both sides have submitted the same videos of recordings from plaintiff's phone. But, the video files do not have ECF numbers.  Therefore, I shall refer to them by the date and number provided by plaintiff in the file he submitted by CD-ROM.  For the other exhibits and the memoranda, the Court cites to the electronic pagination, which does not always correspond to the page number imprinted on the particular submission.

The parties did not provide transcripts of the videos. But, the citations and quotes from the videos are based on the Court's own review of the clips.

Order"); *see also* ECF 16-11.[4] The General Order, which is almost six, single-spaced pages in length, summarizes First Amendment principles and the limitations as to First Amendment rights, explaining that "it is those limits that this General Order addresses." ECF 21-1 at 1.  The express purpose of the General Order, set forth in Section .01, is to "specify guidelines for police response to, and intervention during, public protests, labor strikes, and other activities involving First Amendment rights."  *Id.*

Notably, Section .03, titled "DISCUSSION," states, *id.*: "Limitations to the right to freedom of speech and assembly require that a clear and present danger be evidenced before any law enforcement action can be taken. This means that a police officer must observe a clear and present danger to the health, safety and welfare of the general public, or a violation of the City Code or State Criminal Code before he may engage in enforcement action against those involved in First Amendment activity."

Section .04 of the General Order, titled "POLICY," provides, *id.* at 1:

It is neither the intention nor the desire of the Department to suppress or restrain lawful speech, assembly, religion or any other lawful activity. The Department will expend whatever resources are necessary and appropriate to protect those lawfully exercising their rights pursuant to the First Amendment. However, the Department will require police officers to take appropriate enforcement action whenever there is a clear and present danger to the health, safety and welfare of the general public or a violation of the City Code or State Criminal Code.

And, the "EQUALITY OF TREATMENT" provision, Section .10, mandates, *id.*: "Police department personnel will treat all persons asserting rights under the First Amendment to the U.S. Constitution lawfully."

---

[4] The parties submitted different versions of the General Order. Plaintiff's version was "approved" on October 1, 2012, and defendants' version was "approved" on December 3, 2019, shortly after the incidents in issue. *Compare* ECF 21-1 *with* ECF 16-11. However, plaintiff acknowledges that he did not note any difference in the content of the versions. ECF 21 at 6 n.3. Nonetheless, I shall rely on the version of the General Order (ECF 21-1) submitted by plaintiff.

The General Order specifies actions that are permissible so long as "the activity does not constitute a clear and present danger…." *Id.* at 2; Section .20. An individual may "assemble, preach, distribute literature, picket and protest on public property." *Id.* The General Order defines public property to include "public streets, sidewalks, parks and other common areas so designated." *Id.* And, it states, *id.*: "First Amendment activity on public property is fully protected, subject only to reasonable time, place and manner restrictions. Time, place and manner restrictions may be placed on First Amendment activity so long as those regulations are content neutral, serve a significant governmental interest, and leave open ample alternative channels of communication. Police personnel must consider time, location, and decibel level before attempting to interfere with any First Amendment activity."

In addition, the General Order sets out "NON-PERMISSIBLE ACTIONS." *Id.*; Section .30. Pursuant to the General Order, individuals engaged in First Amendment activities may not "obstruct the path of persons utilizing a public sidewalk" or "interfere with the business of another by use of sound, by blocking entrances to buildings or dwellings; or by obstructing motor vehicles or pedestrian traffic." *Id.* at 2.

According to plaintiff, the General Order "primarily focuses on vague generalities and uninstructive statements"; plaintiff states that it "was obviously deficient in guiding officers on basic concepts and commonly-occurring situations." ECF 12, ¶¶ 20-22. Further, plaintiff posits that the General Order "does not inform officers that leafletters differ from protesters and should be permitted to be within arm's reach…" and that "protesters and leafletters should be able to engage with people who might disagree with them…." *Id.* ¶¶ 23, 24. Plaintiff alleges that Chief Hargis, and "the prior police chief," "implemented, ratified, and approved" this policy." *Id.* ¶ 16.

### B. Carriage Rides and Protests in 2017 and 2018

Donnie Lambert and his daughter, Jessica Lambert, offered horse-drawn carriage rides in Frederick in 2017, 2018, and 2019, "as part of a seasonal promotion by the Downtown Frederick Partnership." ECF 21-5 (Saltz Aff.), ¶ 1; *see also* ECF 16-9 at 5. The events that occurred in 2017 and 2018 provide context for the events at issue in 2019.

Each year, Stacy and Michael Boyer, a husband and wife, organized activities to protest the carriage rides. ECF 21-4 (Stacey Boyer Aff.), ¶ 1. According to Ms. Boyer, in 2017 and 2018 protesters "approached people in line for carriage rides to offer leaflets to people." ECF 21-4, ¶ 3. And, each year "hundreds of people waiting in line for carriage rides were offered leaflets. Approximately 3% of potential riders accepted a leaflet." *Id.* ¶ 4.

In 2017 and 2018, several confrontations occurred between protesters and members of the community during these events. In 2017, for example, a woman was arrested at the carriage ride event for assaulting an animal rights protester. *See* ECF 16-3 (Case Summary Report, Case No. 2017-106820). According to the police report, the woman was reportedly "upset over 'PETA' protesting the use of horses for carriage rides in downtown…." *Id.* at 4. The report indicates that she was standing near a restaurant at 137 North Market Street and yelling at a female protester, then she crossed the street, confronted the protester who was recording her, and "assaulted [the protester] in the process." *Id.*[5] She was subsequently arrested and charged with second degree assault. *Id.* at 1.

According to Saltz, in 2018 the waiting riders "lined up toward and onto North East Street, at the curb, while protesters stood along the corner of the intersection a distance from the

---

[5] It is not clear where the carriage rides and protests were located in 2017. But, plaintiff notes that they were located in a different part of the City than in 2018 and 2019. ECF 21 at 15. And, according to plaintiff, 137 North Market Street was approximately a half mile walk from the 2017 carriage ride location. *Id.*

curb." ECF 21-5, ¶ 4. He contends that the police "did not set up that area" for the protesters, but they "stood there to avoid impeding the line and pedestrian traffic." *Id.*

Defendants have submitted three police reports from incidents that occurred during the protests in 2018. *See* ECF 16-5; ECF 16-6; ECF 16-7. First, on November 3, 2018, a protester, Eikaiua Demlio Boyer, reported to a police officer that "she was spit on." ECF 16-5 (Incident/Investigation Report, Case No. 2018-092476) at 3. The reporting officer stated that he "did not see any spit on Boyer but Boyer stated that a male spit toward her hitting the ground, her legs, and shoes. Boyer said the spit was meant to hit her for sure directly." *Id.* at 3. The officer questioned the man Boyer identified as the person who had spit on her. The individual denied that he had spit at the protester, but he stated that "he was very upset that the protestors ruined the carriage ride for his young daughter and that they made her cry." *Id.*

On the same date, Mr. Boyer reported that a woman walked between the protesters in front of 306 East Church Street and fell onto him and elbowed him. ECF 16-6 (Incident/Investigation Report, Case No. 2018-092510) at 3. The police report states: "No one was injured in the incident, however Boyer advised he would be seeking charges against [the woman] for assault." *Id.*

And, on December 22, 2018, Jessica Lambert, one of the carriage ride operators, reported that three protesters, including Saltz, Mr. Boyer, and a third unidentified male, were "following the carriage shouting obscenities." ECF 16-7 (Incident/Investigation Report, Case No. 2018-107088) at 4. The officer's report, completed on December 27, 2018, stated that, throughout the evening of December 22, 2018, the "Frederick Vegan Army" was standing across the street from the loading/unloading zone for the rides and the protesters were "holding signs and shouting chants regarding their view on the horse carriage rides, mostly when the carriages were in the

area loading or unloading" riders. *Id.* at 3.   At one point in the evening, the "[s]ubjects from the Vegan Army group began walking on the public sidewalk along with the carriage" operated by Ms. Lambert.  *Id.* at 4.   As "the carriage made the right onto N. Benz St. the group paralleled the carriage continuing chanting." *Id.*   According to Ms. Lambert, "the subjects were shouting 'burn in hell' and calling the riders 'fucking shitheads.'" *Id.* After the carriage rides ended that evening, Mr. Lambert contacted the officer "to discuss his concerns regarding the protesters [sic] behavior." *Id.*

Further, the report provides that officers "on scene did observe the subjects utilizing the sidewalk in the area of the carriages on Bentz St., at no time was person [sic] observed in the roadway or interfering with traffic. The words used by the 3 males were not audible to the Officers on scene." *Id.*

The day following this incident, December 23, 2018, the officer contacted Mr. Boyer via text message "regarding the behavior exhibited by the group the evening prior." *Id.* In the report, the officer states that he explained to Boyer that "the behavior of following/harassing the carriage operators or riders would be considered harassment/disorderly conduct and the offender would face an on view criminal arrest." *Id.* Further, he said that the "text message serves as the warning and notice that the harassment was to stop immediately." *Id.* In response, Boyer "stated the obscenities were in response to the riders 'who flip us off and say f*ck you' to them." *Id.* The report noted that there were no additional complaints of harassment during the remaining carriage rides in 2018. *Id.*

### C.  2019

### 1.  Carriage Rides

In 2019, the carriage rides were conducted on November 2, 9, 23, and 29. ECF 21-5, ¶ 2.[6]

Only two days are at issue in this case:  November 2 and November 9, 2019.  On those dates, the

rides began and ended at 306 East Church Street, which is in the middle of the block. ECF 16-9

at 5. East Church Street is a narrow, one-way street located between North East Street and North

Wisner Street. ECF 16-10 (Officer Lawson Aff.), ¶ 4; *see* ECF 16-9 at 6, 9-11 (maps and images

of loading/unloading zone).

Carriage riders were picked up on East Church Street.  From there, the carriages traveled

north on North East Street and then returned south on North East Street and turned left to return

to East Church Street to unload. ECF 16-10, ¶ 7; *see* ECF 16-9 at 6. The individuals waiting for

carriage rides lined up on the sidewalk on the southern side of East Church Street, in the

direction of North Wisner Street. ECF 21-5, ¶ 5.

The FPD set up a "First Amendment Area" for the protesters at the southeast corner of

North East Street and East Church Street, where the protesters could stand with signs and shout

at the carriage riders as they went by. *See* ECF 16-9 at 6; ECF 21-5, ¶ 5; ECF 16-10, ¶ 5.[7]  This

area was only about a half block to the west of the loading site.  ECF 16-1 at 12, 13; *see* ECF 16-

9 at 10; ECF 16-12; ECF 16-13. According to Google Maps, the distance between the carriage

loading zone at 306 East Church Street and the First Amendment Area is about 100 feet. *See*

https://goo.gl/maps/xwtE6fj5cQ3UqnvK7 (last accessed, Apr. 27, 2021). When the carriages

---

[6] Rides were also scheduled for November 16, 2019, but they were canceled due to
inclement weather. ECF 21-5, ¶ 2.

[7] The parties do not specify the exact size of the First Amendment Area, but it appears to
be an area at the corner of the sidewalk. *See* ECF 16-9 at 10. The protesters stood on the portion
of the sidewalk located between the street and the private property adjacent to the sidewalk. *See*
11/2 Video 5; ECF 16-10, ¶ 5.

were returning to the loading zone, traveling south on North East Street and then turning left onto East Church Street, they passed the protesters situated in the First Amendment Area. ECF 16-10, ¶ 7.

According to defendants, the First Amendment Area is the only "nearby public area" that was "large enough to accommodate a group of protesters." ECF 16-1 at 14. Notably, they claim that it is "directly in the path of anyone going to the carriage rides from the only parking garages within walking distance." *Id.* (citing maps on ECF 16-9 at 12; ECF 16-14; ECF 16-15).

### 2. FPD Operations Plan

On October 31, 2019, the FPD issued an "Operations Plan" for the "Horse Drawn Carriage Rides November 2019." *See* ECF 16-9 ("Operations Plan" or "Plan"). The Operations Plan was implemented for "'Protesting Group: Frederick Vegan Army.'" ECF 12, ¶ 25; ECF 16-9 at 1.[8] The Plan described the "Situation," as follows: "Frederick Vegan Army has vowed to protest the horse drawn carriage rides taking place in downtown Frederick." ECF 16-9 at 1.

The Operations Plan set forth the "Mission" of the FPD, *id.* at 2:

- To provide public safety for the general public and participants at the above locations and during any protest that may arise;
- To keep the peace, to enforce applicable laws and to protect everyone's rights concerning trespass, free speech at protests and media activity;
- To respond to any unlawful tactics by protestors or counter-protestors in an effective manner;
- To handle logistical issues surrounding the protest side, protestors and motor vehicle traffic[.]

The Plan established a schedule for "Execution." *Id.* at 2. Lt. Corbett was designated as the supervisor for November 2, 2019, overseeing six other officers. *Id.* Sgt. Wiles was identified as the supervisor for November 9, 2019, overseeing three to four other officers. *Id.* Under the

---

[8] According to plaintiff, the "Frederick Vegan Army" was an informal name used by the protest organizers in 2018 but not in 2019. ECF 12, ¶ 25.

"Admin & Logistics" section of the Operations Plan, General Order 701 is listed as one of the "References." *Id.* at 3. The "Chain of Command" listed Lt. Corbett as the "Incident commander" and Sgt. Wiles as the "Event supervisor." *Id.* Further, the Operations Plan designated Sgt. Wiles as "the point of contact for this event" and stated that she "will coordinate any police response necessary to fulfill the objectives." *Id.* at 4.

In the "Supervisor Responsibilities" section, the Operations Plan stated that upon "arrival the assigned supervisor will", *id.* at 7:

- Designate an area for the protest group, the location will:
  - Be located on public property
  - Be within sight of the carriage rides, but allow enough space between the groups to maintain safety.
  - Allow for quick evacuation of the protestors should a large aggressive protest group form[.]

Further, it provided, *id.* at 7-8:

Upon arrival of the protest group/organizer the supervisor will make contact and provide the following direction:

- Articulate to the organizer it is the intention of the FPD to allow the group to exercise their 1st amendment right to free speech[.]

- Explain to the organizer what is allowed by law and what is not, to include the property lines marked for private property.

- Escort the organizer to the location for the group where they can protest peacefully….

- Explain to the group the protestors are not to go beyond the corner of the building at "The Lerner Collection" on E. Church St. This [will] ensure the adequate space between the groups.[9]

The image that follows depicts the area of the City with both the carriage loading zone and the First Amendment Area. ECF 16-9 at 9. The Operations Plan specified that the sidewalk

---

[9] According to plaintiff, the other group was carriage "riders and potential riders." ECF 12, ¶ 28.

(marked by an arrow), directly opposite from people waiting for carriage rides, "is off limits for [the] protesting group due to the width of the sidewalk." *Id.* at 9.  The Plan explained that the "area has proven to block access to the business and sidewalks when used by protestors." *Id.*

Further, the Plan noted that an area on North East Street, near the corner with East Church Street, "is the best location to have the protestors set up." *Id.* It is shown in the image below as the area with the box between Numbers 1 and 2.  And, the Plan explained that the protesters "will need to stand shoulder to shoulder lining the curb side of the sidewalk." *Id.* According to the Plan, the line for the carriage rides would "form at the loading zone [on East Church Street] and head east, toward Wisner St. [marked by Number 4 in the image]. This will allow separation between the families in line and the protestors." *Id.* at 10.



Plaintiff complains that the Operations Plan was "grossly deficient." ECF 12, ¶ 26. In his view, it "wholly failed to guide officers on basic concepts and commonly-occurring situations (e.g., leafletting, content-neutrality, unreasonably loud noise) and only contained uninstructive generalities…." *Id.* According to plaintiff, the policies in the Operations Plan "were reckless and obviously deficient in their failures to address basic, well-known, and commonly-occurring First Amendment situations…." *Id.* ¶ 30. And, these "obvious omissions were substantially likely to result in the deprivation of First Amendment rights and amounted to deliberate indifference toward the First Amendment rights of citizens." *Id.*

### 3.   The Protests

According to plaintiff, Capt. Sommers was the "immediate supervisor" of Corbett and Wiles at the relevant times.  ECF 12, ¶ 6.

Saltz avers that on November 2 and November 9 of 2019, he "sought to protest the use of horse-drawn carriages by standing across the street from the potential riders, holding signs, and chanting against horse-drawn carriages." ECF 21-5, ¶ 6. In addition, on November 9, he "sought to leaflet potential riders on the southeast side of East Church Street" while they waited in line for a ride. *Id.* ¶ 7. Moreover, Saltz maintains that all "protest-related activities were peaceful" and it was "not the intention to be disobedient" with regard to police orders. *Id.* ¶ 8. In fact, at the protests on both days, Saltz informed the supervising officers that he would "follow all orders" and "was only not protesting and leafletting in the manner desired due to the threat of arrest." *Id.*

Plaintiff claims that on both dates there were approximately 10-15 protesters and 50-85 "potential riders per hour." ECF 21-5, ¶ 3. The protests lasted for approximately two hours each day. *Id.* Video recordings from the protests indicate that the protesters chanted the refrain: "Donnie Lambert [or Jessica Lambert], animal abuser, Shame on you! Shame on you! Shame on

you for what you do!" *See* 11/9 Video 9. The protesters also held signs with similar messages. For instance, one sign stated: "SHAME ON YOU ANIMAL ABUSER[.]" *Id.*; *see also* ECF 16-13 (protester's sign says "ANIMALS ARE NOT OURS FOR ENTERTAINMENT"),

For two reasons, Saltz was "dissatisfied with the designated 'First Amendment Area.'" ECF 21-5, ¶ 9. First, he claims that the "only line of sight between potential riders and protesters was, at best, between (i) a small number of protesters nearest the corner and (ii) a few people at the front of the line waiting to ride the horse-drawn carriages." *Id.* Second, he posits: "Our chanting was not clearly or sufficiently audible to potential riders, especially since there was competing outdoor music at the designated 'First Amended Area.'" *Id.*; *see also* 11/2 Video 5 (showing the distance between the First Amendment Area and the riders waiting in line).  But, according to Officer Lawson, an FPD officer who was assigned to work at the carriage rides on both dates, the riders "could clearly see the protestors on the corner" and "hear what the protestors were saying" while they were waiting for rides. ECF 16-10, ¶ 6.

Notably, the video recordings from both dates show that the protesters were allowed to stand outside of the designated First Amendment Area and hold their signs.  For example, on November 9, 2019, the protesters were allowed to stand on East Church Street, opposite the people waiting in line for rides. *See, e.g.,* 11/9 Video 8 at 3:00.  But, if the protesters were outside of the designated area, they were prohibited from chanting. *See, e.g.,* 11/9 Video 1.

### a.   November 2, 2019

On November 2, 2019, at the beginning of the protest, Lt. Corbett, the supervising police officer at the scene, introduced himself to the protesters and outlined the rules for the protest. *See generally* 11/2 Video 1.  He explained that the "First Amendment Area" was established for the protesters on the east side of North East Street at the corner of East Church Street. 11/2 Video 1

at 2:05. And, within that area, the protesters could make as much noise as they wanted. 11/2 Video 2 at 2:25.

The Lieutenant explained that the protesters could also go outside of the designated area. However, he advised that any person outside of the designated area who made an "unreasonably loud noise" by chanting or yelling would be deemed disorderly and disturbing the peace and subject to arrest. *See* 11/2 Video 1 at 3:30-4:49; 11/2 Video 2 at 2:25, 4:30. When the protesters inquired about the person who was playing loud outdoor music in the same vicinity, Lt. Corbett noted that the music was not considered to be disturbing the public peace. 11/2 Video 1 at 4:48. Lt. Corbett also explained that if any counter-protesters arrived, they would be designated to stand on the sidewalk across the street from the riders and the two groups of protesters could not swap areas. 11/2 Video 1 at 1:45, 5:20. Saltz made it clear to Lt. Corbett that he disagreed with the rules, but indicated that he would comply in order to avoid arrest. *See* 11/2 Video at 1:20.[10]

During the protest on November 2, 2019, Saltz reported to the police that he had been "assaulted." *See* ECF 16-18 (Case Summary Report, Case No. 2019-089766); *see also* ECF 16-16 (Application for Statement of Charges by Jason Saltz, 11/2/2019). According to the police report, Saltz explained that he and Stacy Boyer "were holding their signs standing on the sidewalk when victim/suspect opened her shop door at 120 N. East St." ECF 16-18 at 4. The suspect subsequently "began filming the protesters with her cellphone and yelled, 'I hope someone pushes you in the street and you get hit by a bus,' or something to that affect [sic]." *Id.* According to the report, the victim/suspect "was upset that the protesters were holding large pictures of dead horses in front of her store." *Id.* The report indicates that Saltz "was offended by" her comment, "rushed over to her," and they "confronted each other." *Id.*

---

[10] From the outset of the conversation, the protesters seemed poised to question the officer's instructions and dispute the legality of the rules. *See generally* 11/2 Video 1.

Saltz and the victim/suspect had "different explanations as to what happened" next. *Id.* According to the victim/suspect, "Saltz chest bumped her and put his cellphone within a few inches of her face while Saltz filmed and yelled at her." *Id.* According to Saltz, the victim/suspect "shoved his cellphone out of her face to get Saltz to back up off her" and when she shoved the cellphone "it cause[d] his phone to smack his mouth and cut his lip." *Id.* In "Supplement Notes" written by Lt. Corbett, he explains that he "did not immediately understand that an assault had occurred," but Ms. Boyer and Saltz subsequently told him about it and he "observed the small bloody cut on Saltz [sic] upper lip." *Id.* at 5.  Lt. Corbett explained to Saltz that he did not arrest the woman who allegedly assaulted Saltz because "Maryland law does not allow an officer to make an arrest for a misdemeanor that occurs outside of the officer's presence." *Id.* at 5.

### b.  November 9, 2019

On November 9, 2019, Sgt. Wiles was the supervising officer at the protest. She advised the protesters that they could chant or yell freely within the designated First Amendment Area. 11/9 Video 1 at 00:45. However, Sgt. Wiles also told the protesters that they could stand on the sidewalk opposite the carriage loading area, so long as they did not block the sidewalk. 11/9 Video 1 at 1:20-1:50.

Sgt. Wiles later reaffirmed that the rules from the protest on November 2 still applied.  If the protesters shouted, obstructed, or trespassed outside of the designated area, then the police would take enforcement action. 11/9 Video 9 at 00:20. And, she explained that she was acting on the orders of Captain Sommers. 11/9 Video 9 at 1:15, 3:25. Sgt. Wiles advised that the FPD was enforcing these rules out of concern for the public safety of all the citizens, including the protesters. *Id.* She explained that the FPD was concerned about the assault of protesters, but also

16

said that Mr. Lambert, one of the carriage operators, would feel harassed by chanting outside of the designated area. 11/9 Video 9 at 3:20. Further, Sgt. Wiles noted that the police have historical data that the group waiting in line for carriage rides "do not want to be shouted at and there will be friction…." 11/9 Video 8 at 6:00.

Saltz alleges that the protesters standing across the street from the riders were "told to stand abutting the grass, but if they stepped on the grass [that was allegedly private property] they were warned they were trespassing and subject to arrest if they did it again." ECF 21-5, ¶ 20; *see* 11/9 Video 8 (Sgt. Wiles and the protesters debating potential charges for trespassing on private property on the sidewalk across from the carriage loading zone). Therefore, in order to avoid arrest for trespassing, Saltz asserts that "all activists given such a warning (three activists) moved to the 'First Amendment area' after receiving a trespassing warning." ECF 21-5, ¶ 20.

In addition, Saltz "sought to leaflet" the riders waiting on line "on the southeast side of East Church Street" because that was "the only way" he "could leaflet potential riders of the horse-drawn carriages, to be within arm's reach and conversational distance." ECF 21-5, ¶ 10. Saltz attests that he intended to leaflet in "a civil and gentle manner, while making eye and voice contact from a conversational distance, offer a leaflet at arm's reach informing people about horse-drawn carriages, and engage in civil conversations with anyone interested." *Id.* ¶ 11. Further, he explains that "if anyone is not receptive to receiving information or a leaflet," he would leave them alone. *Id.* ¶ 12. And, if "anyone reacts negatively," he would "immediately disengage and separate." *Id.*

Ms. Boyer explains in her affidavit that the "goal of leafletting is to offer leaflets to persons in a civil and friendly manner at arm's reach, not to be confrontational, and to have civil

discussion in a conversational voice with persons who seek more information." ECF 21-4, ¶ 5. And, she asserts that leafletting "cannot be done effectively at a distance." *Id.*

Sgt. Wiles initially seemed to approve Saltz's request to approach the riders waiting in line to leaflet. ECF 21-5, ¶ 14; *see* 11/9 Video 1 at 3:00. In particular, Saltz told Sgt. Wiles that at some point some of the protesters may hand out leaflets to potential carriage patrons as they wait in line for rides. 11/9 Video 1 at 2:45. In response, Sgt. Wiles said: "O.K., I would just ask don't interfere with the rides." *Id.* at 3:00. But, later in the event, Wiles told Saltz that he could "not [leaflet] within the group [waiting for carriage rides]." 11/9 Video 11 at 00:10. She added: "You can hand that out [*i.e.*, the leaflets] to people as they leave. The separation of the group is vital." *Id.* Further, Sgt. Wiles explained that the separation has to be maintained "because you [*i.e.*, Saltz] were assaulted last week, and…we are trying to preserve the safety of everybody involved." *Id.* at 00:30; *see also id.* at 1:48. She instructed: "I am not going to allow you within the group that has opposing views where you could be assaulted again." *Id.* at 1:30.

Saltz contends, for a variety of reasons, that it "was not acceptable to leaflet people after they had been on a ride and were leaving the area." ECF 21-5, ¶ 13. He points out that the people would have already taken the ride, which he had "hoped to dissuade them from doing"; he "believed people would more readily accept information about why the horse-drawn carriages were wrong before they took the ride than after"; and it was a less efficient way of handing out leaflets. *Id.*

## II.   Standard of Review

As noted, defendants' Motion is styled as a motion to dismiss, or, in the alternative, for summary judgment. ECF 16-1. A motion styled in the alternative implicates the court's

discretion under Rule 12(d) of the Federal Rules of Civil Procedure.  *See Kensington Volunteer Fire Dep't, Inc. v. Montgomery Cty.*, 788 F. Supp. 2d 431, 436-37 (D. Md. 2011).

In general, a court "is not to consider matters outside the pleadings or resolve factual disputes when ruling on a motion to dismiss."  *Bosiger v. U.S. Airways*, 510 F.3d 442, 450 (4th Cir. 2007).  However, under Rule 12(b)(6), a court, in its discretion, may consider matters outside of the pleadings, pursuant to Rule 12(d).  If the court does so, "the motion must be treated as one for summary judgment under Rule 56," and "[a]ll parties must be given a reasonable opportunity to present all the material that is pertinent to the motion."  Fed. R. Civ. P. 12(d).  But, when the movant expressly captions its motion "in the alternative" as one for summary judgment, and submits matters outside the pleadings for the court's consideration, the parties are deemed to be on notice that conversion under Rule 12(d) may occur; the court "does not have an obligation to notify parties of the obvious."  *Laughlin v. Metro. Wash. Airports Auth.*, 149 F.3d 253, 261 (4th Cir. 1998).[11]

A district judge has "complete discretion to determine whether or not to accept the submission of any material beyond the pleadings that is offered in conjunction with a Rule 12(b)(6) motion and rely on it, thereby converting the motion, or to reject it or simply not consider it."  5 C Wright & Miller, Federal Practice & Procedure § 1366 (3d ed. 2018). This discretion "should be exercised with great caution and attention to the parties' procedural rights."  *Id*.  In general, courts are guided by whether consideration of extraneous material "is

---

[11] In contrast, a court may not convert a motion to dismiss to one for summary judgment *sua sponte*, unless it gives notice to the parties that it will do so.  *See Laughlin*, 149 F.3d at 261 (stating that a district court "clearly has an obligation to notify parties regarding any court-instituted changes" in the posture of a motion, including conversion under Rule 12(d)); *Finley Lines Joint Protective Bd. Unit 200 v. Norfolk So. Corp.*, 109 F.3d 993, 997 (4th Cir. 1997) ("[A] Rule 12(b)(6) motion to dismiss supported by extraneous materials cannot be regarded as one for summary judgment until the district court acts to convert the motion by indicating that it will not exclude from its consideration of the motion the supporting extraneous materials.").

likely to facilitate the disposition of the action," and "whether discovery prior to the utilization of the summary judgment procedure" is necessary.  *Id.*

Ordinarily, summary judgment is inappropriate "where the parties have not had an opportunity for reasonable discovery."  *E.I. du Pont de Nemours and Co. v. Kolon Indus., Inc.*, 637 F.3d 435, 448-49 (4th Cir. 2011); *see Zak v. Chelsea Therapeutics Int'l, Ltd.*, 780 F.3d 597, 606 (4th Cir. 2015).  As the Fourth Circuit has said, when a district judge rules on a summary judgment motion prior to discovery, it is akin to "for[cing] the non-moving party into a fencing match without a sword or mask."  *McCray v. Md. Dep't of Transp.*, 741 F.3d 480, 483 (4th Cir. 2014); *see Goodman v. Diggs*, 986 F.3d 493, 500-501 (4th Cir. 2021); *accord Putney v. Likin*, 656 F. App'x 632, 639 (4th Cir. 2016) (per curiam).

However, "the party opposing summary judgment 'cannot complain that summary judgment was granted without discovery unless that party has made an attempt to oppose the motion on the grounds that more time was needed for discovery.'"  *Harrods Ltd. v. Sixty Internet Domain Names*, 302 F.3d 214, 244 (4th Cir. 2002) (quoting *Evans v. Techs. Applications & Serv. Co.*, 80 F.3d 954, 961 (4th Cir. 1996)).  To raise adequately the issue that discovery is needed, the nonmovant typically must file an affidavit or declaration pursuant to Rule 56(d) (formerly Rule 56(f)), explaining why, "for specified reasons, it cannot present facts essential to justify its opposition," without needed discovery.  Fed. R. Civ. P. 56(d); *see Harrods*, 302 F.3d at 244-45 (discussing affidavit requirement of former Rule 56(f)).

"To justify a denial of summary judgment on the grounds that additional discovery is necessary, the facts identified in a Rule 56 affidavit must be 'essential to [the] opposition.'"  *Scott v. Nuvell Fin. Servs., LLC*, 789 F. Supp. 2d 637, 641 (D. Md. 2011) (alteration in original) (citation omitted), *rev'd on other grounds sub. nom. Gardner v. Ally Fin., Inc.*, 514 F. App'x 378

(4th Cir. 2013) (per curiam).  A nonmoving party's Rule 56(d) request for additional discovery is properly denied "where the additional evidence sought for discovery would not have by itself created a genuine issue of material fact sufficient to defeat summary judgment."  *Strag v. Bd. of Trs., Craven Cmty. Coll.*, 55 F.3d 943, 954 (4th Cir. 1995); *see McClure v. Ports*, 914 F.3d 866, 874 (4th Cir. 2019); *Pisano v. Strach*, 743 F.3d 927, 931 (4th Cir. 2014); *Amirmokri v. Abraham*, 437 F. Supp. 2d 414, 420 (D. Md. 2006), *aff'd*, 266 F. App'x 274 (4th Cir. 2008) (per curiam), *cert. denied*, 555 U.S. 885 (2008).

If a nonmoving party believes that further discovery is necessary before consideration of summary judgment, the party who fails to file a Rule 56(d) affidavit does so at his peril, because "'the failure to file an affidavit . . . is itself sufficient grounds to reject a claim that the opportunity for discovery was inadequate.'"  *Harrods,* 302 F.3d at 244 (citations omitted).  But, the non-moving party's failure to file a Rule 56(d) affidavit cannot obligate a court to issue a summary judgment ruling that is obviously premature.

Although the Fourth Circuit has placed "'great weight'" on the Rule 56(d) affidavit, and has said that a mere "'reference to Rule 56(f) [now Rule 56(d)] and the need for additional discovery in a memorandum of law in opposition to a motion for summary judgment is not an adequate substitute for [an] affidavit,'" the appellate court has "not always insisted" on a Rule 56(d) affidavit.  *Id.* (internal citations omitted).  According to the Fourth Circuit, failure to file an affidavit may be excused "if the nonmoving party has adequately informed the district court that the motion is premature and that more discovery is necessary" and the "nonmoving party's objections before the district court 'served as the functional equivalent of an affidavit.'"  *Id.* at 244-45 (internal citations omitted).

Plaintiff has not filed an affidavit under Rule 56(d). Nor has he suggested that he would be prejudiced without additional discovery as to the claims against the individual defendants. Notably, the parties have submitted multiple exhibits.  And, with one exception, plaintiff has not challenged the defense's exhibits to the Motion. *See* ECF 21 at 15 n.13.[12]  Thus, the record is well developed as to the incidents on November 2 and 9, 2019.

Further, plaintiff has framed part of his Opposition to the Motion as an opposition to a motion for summary judgment. *See* ECF 21 at 1. Plaintiff indicates only that he requires additional discovery to pursue his *Monell* claims. ECF 21 at 50. In particular, plaintiff recognizes that "the individual defendants have filed for summary judgment regarding (a) the predicate constitutional violation and (b) qualified immunity" and the "City of Frederick has moved to dismiss the *Monell* claims" and the supervisory liability claims as to Sommers and Hargis. *Id.* And, he states: "Mr. Saltz responds accordingly." *Id.*

Accordingly, I am satisfied that it is appropriate to address the Motion as one for summary judgment with respect to the claims against the individual defendants (Counts 2 and 4), because this will facilitate disposition of the case. But, like plaintiff, I shall construe the Motion as one to dismiss with regard to the *Monell* claims (Counts 1 and 3).

Therefore, as to the claims against Corbett and Wiles, I look to Fed. R. Civ. P. 56. Under Rule 56(a) of the Federal Rules of Civil Procedure, summary judgment is appropriate only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322-24 (1986); *see also Cybernet, LLC v. David*, 954 F.3d 162, 168 (4th Cir. 2020); *Variety Stores, Inc. Wal-Mart*

---

[12] Plaintiff takes issue with ECF 16-8, an email from a "Parks and Recreation employee conveying what he heard" about the protesters. ECF 21 at 15 n.13. According to Saltz, the email is not sufficiently reliable, "even for police purposes," because it is "double or triple hearsay." *Id.*  This exhibit is not material, however, and I need not consider it.

*Stores, Inc.*, 888 F.3d 651, 659 (4th Cir. 2018); *Iraq Middle Mkt. Dev. Found v. Harmoosh*, 848 F.3d 235, 238 (4th Cir. 2017).   To avoid summary judgment, the nonmoving party must demonstrate that there is a genuine dispute of material fact so as to preclude the award of summary judgment as a matter of law.   *Ricci v. DeStefano*, 557 U.S. 557, 585-86 (2009); *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 585-86 (1986); *see also Gordon v. CIGNA Corp.*, 890 F.3d 463, 470 (4th Cir. 2018).

The Supreme Court has clarified that not every factual dispute will defeat a summary judgment motion.   "By its very terms, this standard provides that the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986) (emphasis in original). A fact is "material" if it "might affect the outcome of the suit under the governing law."   *Id.* at 248.

There is a genuine issue as to material fact "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."   *Id.*; *see CTB, Inc. v. Hog Slat, Inc.*, 954 F.3d 647, 658 (4th Cir. 2020); *Variety Stores, Inc.*, 888 F.3d at 659; *Sharif v. United Airlines, Inc.*, 841 F.3d 199, 2014 (4th Cir. 2016); *Libertarian Party of Va. v. Judd*, 718 F.3d 308, 313 (4th Cir. 2013).   On the other hand, summary judgment is appropriate if the evidence "is so one-sided that one party must prevail as a matter of law."   *Anderson*, 477 U.S. at 252.   But, "the mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff."   *Id.*

"A party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of [its] pleadings,' but rather must 'set forth specific facts showing that there is a genuine issue for trial.'"   *Bouchat v. Balt. Ravens Football Club, Inc.*, 346

23

F.3d 514, 522 (4th Cir. 2003) (quoting former Fed. R. Civ. P. 56(e)), *cert. denied*, 541 U.S. 1042 (2004); *see Celotex*, 477 U.S. at 322-24.  And, the court must view all of the facts, including reasonable inferences to be drawn from them, in the light most favorable to the nonmoving party. *Ricci*, 557 U.S. at 585-86; *Matsushita Elec. Indus. Co.*, 475 U.S. at 587; *accord Hannah P. v. Coats*, 916 F.3d 327, 336 (4th Cir. 2019); *Variety Stores, Inc.*, 888 F.3d at 659; *Gordon*, 890 F.3d at 470; *Lee v. Town of Seaboard*, 863 F.3d 323, 327 (4th Cir. 2017); *FDIC v. Cashion*, 720 F.3d 169, 173 (4th Cir. 2013).

The district court's "function" is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial."  *Anderson*, 477 U.S. at 249; *accord Guessous v. Fairview Prop. Invs., LLC*, 828 F.3d 208, 216 (4th Cir. 2016).  Thus, in considering a summary judgment motion, the court may not make credibility determinations. *Wilson v. Prince George's Cty.*, 893 F.3d 213, 218-19 (4th Cir. 2018); *Jacobs v. N.C. Administrative Office of the Courts*, 780 F.3d 562, 569 (4th Cir. 2015); *Mercantile Peninsula Bank v. French*, 499 F.3d 345, 352 (4th Cir. 2007).  Therefore, in the face of conflicting evidence, such as competing affidavits, summary judgment ordinarily is not appropriate, because it is the function of the fact-finder to resolve factual disputes, including matters of witness credibility.  *See Black & Decker Corp. v. United States*, 436 F.3d 431, 442 (4th Cir. 2006); *Dennis v. Columbia Colleton Med. Ctr., Inc.*, 290 F.3d 639, 644-45 (4th Cir. 2002).  That said, "a party's 'self-serving opinion ... cannot, absent objective corroboration, defeat summary judgment.'"  *CTB, Inc.*, 954 F.3d at 658-59 (quoting *Williams v. Giant Food Inc.,* 370 F.3d 423, 433 (4th Cir. 2004)).  In other words, "[u]nsupported speculation is not sufficient to defeat a summary judgment motion."  *Felty v. Graves-Humphreys Co.*, 818 F.2d 1126, 1128 (4th Cir. 1987); *Harris v. Home Sales Co.*, 499 F. App'x 285, 294 (4th Cir. 2012).

In sum, to avoid summary judgment, there must be a genuine dispute as to material fact. In *Iraq Middle Mkt. Dev. Found.*, 848 F.3d at 238, the Court reiterated: "A court can grant summary judgment only if, viewing the evidence in the light most favorable to the non-moving party, the case presents no genuine issues of material fact and the moving party demonstrates entitlement to judgment as a matter of law."

As to the *Monell* claims and the claims against Hargis and Sommers, I shall apply Rule 12(b)(6).   A defendant may test the legal sufficiency of a complaint by way of a motion to dismiss under Rule 12(b)(6).  *Paradise Wire & Cable Defined Benefit Pension Plan v. Weil*, 918 F.3d 312, 317 (4th Cir. 2019); *In re Birmingham*, 846 F.3d 88, 92 (4th Cir. 2017); *Goines v. Valley Cmty. Servs. Bd.*, 822 F.3d 159, 165-66 (4th Cir. 2016); *McBurney v. Cuccinelli*, 616 F.3d 393, 408 (4th Cir. 2010), *aff'd sub nom.*, *McBurney v. Young*, 569 U.S. 221 (2013); *Edwards v. City of Goldsboro*, 178 F.3d 231, 243 (4th Cir. 1999).  A Rule 12(b)(6) motion constitutes an assertion by a defendant that, even if the facts alleged by a plaintiff are true, the complaint fails as a matter of law "to state a claim upon which relief can be granted."  Fed. R. Civ. P. 12(b)(6).

Whether a complaint states a claim for relief is assessed by reference to the pleading requirements of Fed. R. Civ. P. 8(a)(2).  That rule provides that a complaint must contain a "short and plain statement of the claim showing that the pleader is entitled to relief."   The purpose of the rule is to provide the defendants with "fair notice" of the claims and the "grounds" for entitlement to relief.  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555-56 (2007).

To survive a motion under Rule 12(b)(6), a complaint must contain facts sufficient to "state a claim to relief that is plausible on its face."  *Twombly*, 550 U.S. at 570; *see Ashcroft v. Iqbal*, 556 U.S. 662, 684 (2009) ("Our decision in *Twombly* expounded the pleading standard for 'all civil actions' . . . ." (citation omitted)); *see also Paradise Wire & Cable*, 918 F.3d at 317;

*Willner v. Dimon*, 849 F.3d 93, 112 (4th Cir. 2017).   To be sure, a plaintiff need not include "detailed factual allegations" in order to satisfy Rule 8(a)(2).   *Twombly*, 550 U.S. at 555. Moreover, federal pleading rules "do not countenance dismissal of a complaint for imperfect statement of the legal theory supporting the claim asserted."   *Johnson v. City of Shelby*, *Miss.*, 574 U.S. 10, 10 (2014) (per curiam).   But, mere "'naked assertions' of wrongdoing" are generally insufficient to state a claim for relief.   *Francis v. Giacomelli*, 588 F.3d 186, 193 (4th Cir. 2009) (citation omitted).

### III.    Discussion

Plaintiff alleges, *inter alia*, that the City's restrictions on November 2 and November 9, 2019, violated his rights under the First Amendment.   In his view, they were viewpoint and content-based burdens on his speech that cannot withstand strict scrutiny.

As noted, defendants seek to dismiss the supervisory liability claims against Hargis and Sommers in Counts 2 and 4, for failure to state a claim.   And, they seek summary judgment as to plaintiff's claims against Wiles and Corbett in Counts 2 and 4.

Defendants do not dispute that, at the relevant times, plaintiff was engaging in protected First Amendment activities in a traditional public forum. *See* ECF 16-1 at 22. But, they argue, *inter alia*, that the restrictions on Saltz's protected activities were content-neutral. Therefore, defendants contend that the restrictions are subject only to intermediate scrutiny, and they constituted valid time, place, and manner limitations under that standard.   ECF 16-1 at 20-33. Even if the restrictions are subject to strict scrutiny, however, defendants maintain that there was no First Amendment violation because the restrictions were narrowly tailored to serve a compelling government interest.   *Id.* at 33-34.   Alternatively, they argue that, even if the officers

committed a constitutional violation, it was not clearly established, so the individual defendants are entitled to qualified immunity. *Id.* at 37.

Additionally, defendants contend that the claims against Frederick (Counts 1 and 3) are subject to dismissal because they are not actionable under *Monell*. *Id.* at 34.  But, if the *Monell* claims are not dismissed, defendants seek to bifurcate them. *Id.* at 35.

I shall address these contentions, in turn.

### A.  Individual Officers

### 1. Section 1983 Generally

Plaintiff filed suit pursuant to 42 U.S.C. § 1983.  Under § 1983, a plaintiff may file suit against any person who, acting under color of state law, "subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws" of the United States. *See, e.g.*, *Filarsky v. Delia*, 566 U.S. 377 (2012); *see also Owens v. Balt. City State's Attorney's Office*, 767 F.3d 379 (4th Cir. 2014), *cert. denied sub nom. Balt. City Police Dep't v. Owens*, 575 U.S. 983 (2015).  However, § 1983 "'is not itself a source of substantive rights,' but provides 'a method for vindicating federal rights elsewhere conferred.'"  *Albright v. Oliver*, 510 U.S. 266, 271 (1994) (quoting *Baker v. McCollan*, 443 U.S. 137, 144 n.3 (1979)); *see Safar v. Tingle*, 859 F.3d 241, 245 (4th Cir. 2017).  In other words, § 1983 allows "a party who has been deprived of a federal right under the color of state law to seek relief."  *City of Monterey v. Del Monte Dunes at Monterey, Ltd.*, 526 U.S. 687, 707 (1999).

To state a claim under § 1983, a plaintiff must allege (1) that a right secured by the Constitution or laws of the United States was violated, and (2) that the alleged violation was committed by a "person acting under the color of state law."  *West v. Atkins*, 487 U.S. 42, 48

(1988); *see Davison v. Randall*, 912 F.3d 666, 679 (4th Cir. 2019); *Crosby v. City of Gastonia*, 635 F.3d 634, 639 (4th Cir. 2011), *cert. denied*, 565 U.S. 823 (2011); *Wahi v. Charleston Area Med. Ctr., Inc.*, 562 F.3d 599, 615 (4th Cir. 2009); *Jenkins v. Medford*, 119 F.3d 1156, 1159-60 (4th Cir. 1997). "The first step in any such claim is to pinpoint the specific right that has been infringed." *Safar*, 859 F.3d at 245.

The phrase "under color of state law" is an element that "'is synonymous with the more familiar state-action requirement' for Fourteenth Amendment claims, 'and the analysis for each is identical.'" *Davison*, 912 F.3d at 679 (quoting *Philips v. Pitt Cty. Mem'l Hosp.*, 572 F.3d 176, 180 (4th Cir. 2009)); *see also Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 929 (1982). A person acts under color of state law "only when exercising power 'possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law.'" *Polk County v. Dodson*, 454 U.S. 312, 317-18 (1981) (quoting *United States v. Classic*, 313 U.S. 299, 326 (1941)); *see also Philips*, 572 F.3d at 181 ("[P]rivate activity will generally not be deemed state action unless the state has so dominated such activity as to convert it to state action: Mere approval of or acquiescence in the initiatives of a private party is insufficient.") (citations and internal quotation marks omitted).

It is undisputed that the officers were acting within the scope of their employment with the FPD. And, they were acting under the color of state and municipal law when they allegedly restricted Saltz's First Amendment rights. ECF 12, ¶ 5, 6; ECF 16-1 at 18-19.

Hargis and Sommers were not at the scene of the protests. Under § 1983, there must be a showing of personal fault based upon a defendant's personal conduct. *See Vinnedge v. Gibbs*, 550 F.2d 926, 928 (4th Cir. 1977) (stating that for an individual defendant to be held liable pursuant to 42 U.S.C. § 1983, the plaintiff must affirmatively show that the official acted personally to

deprive the plaintiff of his rights). As discussed, *infra*, there is no respondeat superior liability under § 1983. *Iqbal*, 556 U.S. at 676 ("Because vicarious liability is inapplicable to ... § 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution."); *see also Wilcox v. Brown*, 877 F.3d 161, 170 (4th Cir. 2017); *Love-Lane v. Martin*, 355 F.3d 766, 782 (4th Cir. 2004); *Trulock v. Freeh*, 275 F.3d 391, 402 (4th Cir. 2001).

### 2.   First Amendment Generally

The First Amendment to the Constitution provides: "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the government for a redress of grievances."  This mandate "means that government generally has no power to restrict expression because of its message, its ideas, its subject matter, or its content."  *Barr v. Am. Assoc. of Political Consultants, Inc.*, ___ U.S. ___, 140 S. Ct. 2335, 2346 (2020) (quotation marks and citation omitted).

"The First Amendment 'was fashioned to assure unfettered interchange of ideas for the bringing about of political and social changes desired by the people.'"  *Connick v. Myers*, 461 U.S. 138, 145 (1983) (quoting *Roth v. United States*, 354 U.S. 476, 484 (1957)).  "'Premised on mistrust of governmental power" it "stands against attempts to disfavor certain subjects or viewpoints.'"  *Am. Civil Liberties Union of N. Carolina v. Tata*, 742 F.3d 563, 565-66 (4th Cir. 2014) (quoting *Citizens United v. Fed. Election Comm'n,* 558 U.S. 310, 340 (2010)).

The Supreme Court has said: "The hallmark of the protection of free speech is to allow 'free trade in ideas'—even ideas that the overwhelming majority of people might find distasteful or discomforting."  *Virginia v. Black*, 538 U.S. 343, 365 (2003) (quoting *Abrams v. United*

*States,* 250 U.S. 616, 630 (1919) (Holmes, J., dissenting)). A "core postulate of free speech law" is that the "government may not discriminate against speech based on the ideas or opinions it conveys." *Iancu v. Brunetti*, ___ U.S. ___, 139 S. Ct. 2294, 2299 (2019). Put another way, the government "'ordinarily'" may not "'prohibit dissemination of social, economic and political doctrine which a vast majority of its citizens believes to be false and fraught with evil consequence.'" *Virginia*, 538 U.S. at 365; *see Turner Broad. Sys., Inc. v. F.C.C.*, 512 U.S. 622, 642 (1994); *Police Dep't of City of Chicago v. Mosley*, 408 U.S. 92, 95 (1972); *Am. Booksellers Ass'n, Inc. v. Hudnut*, 771 F.2d 323, 328 (7th Cir. 1985), *aff'd*, 475 U.S. 1001 (1986).

Of relevance here, "governmental entities are 'strictly limited' in their ability to regulate private speech in public fora." *Davison*, 912 F.3d at 681 (quoting *Pleasant Grove City, Utah v. Summum*, 555 U.S. 460, 469 (2009)). And, the Supreme Court has recognized various kinds of public fora. *See Am. Civil Liberties Union v. Mote*, 423 F.3d 438, 443 (4th Cir. 2005).[13] Public streets, sidewalks, and parks are the "archetype of a traditional public forum." *Frisby v. Schultz*, 487 U.S. 474, 480 (1988). And, in the traditional public forum, "speakers' rights are at their apex." *Steinburg v. Chesterfield Cnty. Planning Comm'n*, 527 F.3d 377, 384 (4th Cir. 2008). Indeed, these areas occupy a "special position in terms of First Amendment protection" because, for "[t]ime out of mind," they "have been used for public assembly and debate." *Snyder v. Phelps*, 562 U.S. 443, 456 (2011) (citations and internal quotation marks omitted) (alteration in *Snyder*).

---

[13] For the purpose of analyzing restrictions of speech on public property, the Supreme Court has divided property into various categories: the traditional public forum, the designated public forum, and the limited public forum. *See Christian Legal Soc'y v. Martinez*, 561 U.S. 661, 679 (2010); *Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 46 (1983). A designated public forum is "'not traditionally . . . open to the public'" but has been opened by the government "'for expressive activity.'" *Randall*, 912 F.3d at 681-82 (citation omitted).

Of course, certain categories of speech deemed to be of "'slight social value'" do not receive the protections of the First Amendment. *Virginia*, 538 U.S. at 358 (citation omitted). Thus, even in public fora, the right to speak freely is "not absolute." *Id.* These categories include "fighting words," incitement of "imminent lawless action," and true threats, among others. *Id.* (citations omitted); *see R.A.V. v. St. Paul,* 505 U.S. 377, 383 (1992); *Glenn v. Holder*, 690 F.3d 417, 421 (6th Cir. 2012); *United States v. Bly*, 510 F.3d 453, 458 (4th Cir. 2007).

Moreover, the "government 'ha[s] a substantial interest in protecting its citizens from unwelcome noise.'" *Ward v. Rock Against Racism*, 491 U.S. 781, 796 (1989) (quoting *City Council of Los Angeles v. Taxpayers for Vincent*, 466 U.S. 789, 806 (1984)) (alteration in *Ward*). Although this interest is at its height when protecting the "'well-being, tranquility, and privacy of the home,'" *Frisby*, 487 U.S. at 484 (quoting *Carey v. Brown*, 447 U.S. 455, 471 (1980)), "the government may act to protect even such public forums as city streets and parks from excessive noise." *Ward*, 491 U.S. at 796 (citing *Kovacs v. Cooper*, 336 U.S. 77, 86-87 (1949)). "'[E]xcessive' noise by definition means something above and beyond the ordinary noises associated with the appropriate and customary uses" of the forum. *United States v. Doe*, 968 F.2d 86, 89 (D.C. Cir. 1992).

The First Amendment "protects speech along a spectrum." *Fusaro v. Cogan*, 930 F.3d 241, 248 (4th Cir. 2019). Laws burdening speech "receive different levels of judicial scrutiny depending on the type of regulation and the justifications and purposes underlying it." *Stuart v. Camnitz*, 774 F.3d 238, 244 (4th Cir. 2014). The level of scrutiny depends on whether the regulation is content-based or content-neutral. *Barr*, 140 S. Ct. at 2346.

"Viewpoint-based discrimination occurs when a government official 'targets not subject matter, but particular views taken by speakers on a subject.'" *Robertson v. Anderson Mill*

*Elementary Sch.*, 989 F.3d 282, 290 (4th Cir. 2021) (quoting *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 829 (1995)).  Viewpoint-based restrictions are a subset of content-based restrictions. *See Barr*, 140 S. Ct. at 2346; *McCullen v. Coakley*, 573 U.S. 464, 484-85 (2014) (noting than an exemption for a group on only one side of the abortion debate would constitute a clear form of viewpoint discrimination); *Davison*, 912 F.3d at 687 (stating that viewpoint discrimination "'targets'" a speaker's view on a subject and concluding that public official's conduct in banning a constituent from the public official's Facebook page constituted viewpoint discrimination) (citation omitted); *Sons of Confederate Veterans, Inc. ex rel. Griffin v. Comm'r of Virginia Dep't of Motor Vehicles*, 288 F.3d 610, 623 (4th Cir. 2002) ("Viewpoint discrimination is a kind of content discrimination, but is not always easily distinguishable."). Further, "[w]hen the government targets not subject matter, but particular views taken by speakers on a subject, the violation of the First Amendment is all the more blatant.... Viewpoint discrimination is thus an egregious form of content discrimination." *Rosenberger*, 515 U.S. at 829.

"Content-based laws are subject to strict scrutiny." *Barr*, 140 S. Ct. at 2346 (citing *Reed*, 576 U.S. at 163-64); *see Ysursa v. Pocatello Educ. Ass'n*, 555 U.S. 353, 358 (2009) ("Restrictions on speech based on its content are 'presumptively invalid' and subject to strict scrutiny.") (citation omitted); *Bible Believers v. Wayne Cty., Mich.*, 805 F.3d 228, 248 (6th Cir. 2015) ("Both content- and viewpoint-based discrimination are subject to strict scrutiny."). Strict scrutiny "'requires the Government to prove that the restriction furthers a compelling interest and is narrowly tailored to achieve that interest.'" *Reed*, 576 U.S. at 171 (quoting *Arizona Free Enterprise Club's Freedom Club PAC v. Bennett,* 564 U.S. 721, 734 (2011)); *see Cent. Radio Co. Inc. v. City of Norfolk, Va.*, 811 F.3d 625, 633 (4th Cir. 2016). And, as to narrow tailoring,

the government must "prove that no 'less restrictive alternative' would serve its purpose." *Cent. Radio Co.*, 811 F.3d at 633 (*citing United States v. Playboy Entm't Grp., Inc.*, 529 U.S. 803, 813 (2000)); *see Antietam Battlefield KOA v. Hogan*, 461 F. Supp. 3d 214, 237 (D. Md. 2020).

The "government has no power to restrict expression because of its message, its ideas, its subject matter, or its content." *Mosley*, 408 U.S. at 95.  Therefore, "'a viewpoint-based restriction of private speech rarely, if ever, will withstand strict scrutiny review.'"  *Greater Balt. Ctr. for Pregnancy Concerns, Inc. v. Mayor & City Council of Balt.*, 721 F.3d 264, 288 (4th Cir. 2013) (citation omitted).  But, "[a] regulation that serves purposes unrelated to the content of expression is deemed [content] neutral, even if it has an incidental effect on some speakers or messages but not others." *Ward*, 491 U.S. at 791; *see, e.g., Renton v. Playtime Theatres, Inc.*, 475 U.S. 41, 47–49 (1986) (upholding zoning regulations for adult movie theaters against First Amendment challenge because regulations were justified by city's concern for "secondary effects" on surrounding neighborhoods, even though the regulations "treat[ed] theaters that specialize in adult films differently from other kinds of theaters"). And, "even in a public forum the government may impose reasonable restrictions on the time, place, or manner of protected speech . . . ." *Ward*, 491 U.S. at 791 (citation omitted); *see City of Cincinnati v. Discovery Network, Inc.*, 507 U.S. 410, 428 (1993).

In order to pass intermediate scrutiny, a "time, place, and manner" restriction on speech must (1) be "'justified without reference to the content of the regulated speech'"; (2) be "'narrowly tailored to serve a significant governmental interest'"; and (3) "'leave open ample alternative channels for communication of the information'" that the speaker wishes to

communicate. *Ward*, 491 U.S. at 791 (quoting *Clark v. Cmty. for Creative Non–Violence*, 468 U.S. 288, 293 (1984)).[14]

Although "a regulation of the time, place, or manner of protected speech must be narrowly tailored to serve the government's legitimate, content-neutral interests," and the regulation may not "burden substantially more speech than is necessary to further the government's legitimate interests," it "need not be the least restrictive or least intrusive means of doing so." *Ward*, 491 U.S. at 798 (footnote omitted). "Rather, the requirement of narrow tailoring is satisfied 'so long as the ... regulation promotes a substantial government interest that would be achieved less effectively absent the regulation.'" *Id.* at 799 (citations omitted). In other words, "[s]o long as the means chosen are not substantially broader than necessary to achieve the government's interest, ... the regulation will not be invalid simply because a court concludes that the government's interest could be adequately served by some less-speech-restrictive alternative." *Id.* at 800.

Under either strict scrutiny or intermediate scrutiny, the government bears the burden of proving the constitutionality of the regulation. *See Ashcroft v. Am. Civil Liberties Union*, 542 U.S. 656, 665 (2004) ("When plaintiffs challenge a content-based speech restriction, the burden is on the Government to prove that the proposed alternatives will not be as effective . . . ."); *44 Liquormart, Inc. v. Rhode Island*, 517 U.S. 484, 505 (1996); *accord Deegan v. City of Ithaca*, 444 F.3d 135, 142 (2d Cir. 2006) (holding that government bears the burden of showing the restriction is narrowly tailored and justified by the interest asserted).

---

[14] The phrase "narrowly tailored" is used with respect to both intermediate and strict scrutiny. But, the tests are distinguishable by their other terms. As Justice Kennedy explained in *Ward*, 491 U.S. 781, "[w]hile time, place, or manner regulations must also be 'narrowly tailored' in order to survive First Amendment challenge...the same degree of tailoring is not required of these [content-neutral] regulations." *Id.* at 798 n.6.

### 3.  Analysis

The "threshold question" in addressing any First Amendment challenge is "'whether any protected First Amendment right is involved.'"  *Billups v. City of Charleston*, 961 F.3d 673, 682 (4th Cir. 2020) (quoting *Willis v. Town of Marshall*, 426 F.3d 251, 257 (4th Cir. 2005)).  If so, then the court must ascertain "whether the Governmental action in question infringes that right." *Billups*, 961 F.3d at 682.

It is undisputed that plaintiff's activities of protesting and leafletting constitute constitutionally protected speech, and defendants do not contend otherwise. Activities such as demonstrations, protests, and leafletting "are expressive activities involving 'speech' protected by the First Amendment." *United States v. Grace*, 461 U.S. 171, 176 (1983).  Indeed, "[l]eafletting and commenting on matters of public concern are classic forms of speech that lie at the heart of the First Amendment...." *Schenck v. Pro–Choice Network of W.N.Y.*, 519 U.S. 357, 358 (1997); *see Edwards v. South Carolina*, 372 U.S. 229 (1963); *see also Hotel Emps. & Rest. Emps. Union, Loc. 100 of New York, N.Y. & Vicinity, AFL CIO v. City of New York Dep't of Parks & Recreation,* 311 F.3d 534, 539 (2d. Cir. 2002) ("[L]eafletting [is] a form[ ] of speech protected under the First Amendment."). Moreover, as noted, the sidewalk where the activities in this case took place qualifies as a traditional public forum where "speakers' rights are at their apex." *Steinburg*, 527 F.3d at 384.

Thus, the threshold question is whether the restrictions imposed on Saltz are subject to strict scrutiny as content-based restrictions, or intermediate scrutiny as content-neutral restrictions. As noted, to the extent that a restriction is "'based on the content of ... speech," it "'must satisfy strict scrutiny, that is, the restriction must be narrowly tailored to serve a

compelling government interest.'" *Christian Legal Soc'y v. Martinez*, 561 U.S. 661, 679 n.11 (2010) (quoting *Pleasant Grove*, 555 U.S. at 469) (alteration in original).

The Supreme Court's decision in *Reed*, 576 U.S. 155, serves as the touchstone for the content neutrality analysis.   Prior to *Reed*, the Fourth Circuit had instructed that, "when conducting the content-neutrality inquiry, '[t]he government's purpose is the controlling consideration.'" *Cahaly v. Larosa*, 796 F.3d 399, 405 (4th Cir. 2015) (citation omitted) (brackets in *Cahaly*).   However, in *Reed* the Supreme Court "rejected such an approach."  *Cent. Radio Co.*, 811 F.3d at 632; s*ee also Barr*, 140 S. Ct. at 2346 (citing *Reed*).   In *Lucero v. Early*, 873 F.3d 466, 470 (4th Cir. 2017), the Fourth Circuit explained: "'Because the government's purpose in adopting a law is no longer "the controlling consideration,' *Reed* was a crucial decision, 'abrogat[ing] our Circuit's previous formulation for analyzing content neutrality.'"   (Quoting *Cent. Radio Co.*, 811 F.3d at 632).

Summarizing the two-step methodology prescribed by *Reed*, the *Lucero* Court said, 873 F.3d at 470 (brackets and ellipses added):

> First, a court should ask whether a law "on its face draws distinctions based on the message a speaker conveys."  [*Reed*, 576 U.S. at 163]. . . .  If so, the law is content based regardless of "the government's justification or purpose" in enacting it. *Cent. Radio Co.* [], 811 F.3d [at] 632 [].  Second, even if the law is facially content neutral, it can nonetheless be considered content based if it "cannot be justified without reference to the content of the regulated speech, or [it was] adopted by the government because of disagreement with the message the speech conveys."  *Reed*, [576 U.S. at 164]. . . .

Defendants contend that any restrictions placed on plaintiff were content-neutral because, pursuant to the relevant policies and enforcement of those policies, all protesters were treated alike. ECF 26 at 12. And, they maintain that the restrictions were a reasonable means of "preventing criminal conduct, preserving the peace, and protecting the rights of a captive audience of waiting riders." *Id.* at 6; *see* ECF 16-1 at 25-26; *see also* "Disturbing the public

36

peace and disorderly conduct," Md. Code (2012 Repl. Vol.), § 10-201 of the Criminal Law Article; *Eanes v. State*, 318 Md. 436, 569 A.2d 604 (1990). Further, they posit that the restrictions were justified "because the history of the protests show[ed] there is a risk to public safety." ECF 16-1 at 19.

Plaintiff counters that the restrictions were content-based because they were clearly about "shielding riders, potential riders, and carriage operators from people yelling and chanting with a viewpoint opposed to the carriage riders." ECF 21 at 26. Thus, he concludes that both the chanting and leafletting restrictions constitute a "heckler's veto" and are presumptively unconstitutional. ECF 21 at 40. To support his argument, plaintiff points to evidence that indicates the officers were not actually concerned with excessive noise or public safety at the event. *See, e.g., id.* at 19, 26.

It is a fundamental principle of First Amendment jurisprudence that the "[l]isteners' reaction to speech is not a content-neutral basis for regulation." *Forsyth County v. Nationalist Movement*, 505 U.S. 123, 134 (1992) (invalidating ordinance that allowed county administrator to adjust parade permit fees based on anticipated cost of security); *see Gathright v. City of Portland*, 439 F.3d 573, 578 (9th Cir. 2006) ("First Amendment jurisprudence is clear that the way to oppose offensive speech is by more speech, not censorship, enforced silence or eviction from legitimately occupied public space."); *Ovadal v. City of Madison*, 416 F.3d 531, 537 (7th Cir. 2005) (a content-based restriction of speech is likely when "every proffered justification" for the restriction is "directly related to the reactions" of the audience). "Speakers of protected speech—even speech that is offensive to many listeners—may not be punished because their critics 'might react with disorder or violence.'" *Deferio v. City of Syracuse*, 306 F. Supp. 3d 492, 510 (N.D.N.Y. 2018) (quoting *Brown v. Louisiana*, 383 U.S. 131, 133 n.1 (1966)); *see Boos v.*

*Barry*, 485 U.S. 312, 322 (1988) ("[I]n public debate our own citizens must tolerate insulting, and even outrageous, speech in order to provide adequate breathing space to the freedoms protected by the First Amendment.") (citations and internal quotation marks omitted). Indeed, "[s]peech that stirs passions, resentment or anger is fully protected by the First Amendment." *Collins v. Jordan*, 110 F.3d 1363, 1371 (9th Cir. 1996).

In *McCullen*, 573 U.S. 464, a Supreme Court decision that both sides cite at length, the Court considered the constitutionality of a Massachusetts law imposing a fixed 35-foot buffer zone around the entrance, exit, and driveway of every abortion clinic in the state. Pro-life "protestors" challenged the law, arguing that the buffer-zone law was a content-based restriction on speech, subject to strict scrutiny. *Id.* at 472-73. The Court disagreed.

The Court observed that "the Act does not draw content-based distinctions on its face." *Id.* at 479. To be sure, the Court explained, the Massachusetts law "would be content based if it required enforcement authorities to examine the content of the message that is conveyed to determine whether a violation has occurred." *Id.* (quotation marks omitted). But enforcement of the law turned not on what people said while in the buffer zone "but simply on where they sa[id] it." *Id.* "Indeed," said the Court, a person could "violate the Act merely by standing in a buffer zone, without displaying a sign or uttering a word." *Id.* Notably, the Court also stated, *id.* at 481:

> To be clear, the Act would not be content neutral if it were concerned with [the] undesirable effects that arise from the direct impact of speech on its audience or listeners' reactions to speech.... If, for example, the speech outside Massachusetts abortion clinics caused offense or made listeners uncomfortable, such offense or discomfort would not give the Commonwealth a content-neutral justification to restrict the speech.

As mentioned, defendants rely on public safety concerns as their primary justification for the restrictions. "While an interest in public safety is a content-neutral basis to regulate speech, *see Davenport v. City of Alexandria*, 710 F.2d 148, 151 (4th Cir. 1983) (en banc), safety

concerns arising from a prediction of how listeners might react to speech cannot be effectively de-coupled from speech content." *Rock for Life-UMBC v. Hrabowski*, 411 F. App'x 541, 552 (4th Cir. 2010). Moreover, "the Supreme Court has repeatedly held that laws combining content-based and content-neutral factors are nonetheless content-based." *Thomas v. Bright,* 937 F.3d 721, 732–33 (6th Cir. 2019).  And, "[t]he government must abstain from regulating speech when the specific motivating ideology or the opinion or perspective of the speaker is the rationale for the restriction." *Rosenberger*, 515 U.S. at 829.

Viewing the evidence in the light most favorable to plaintiff, the statements by Lt. Corbett and Sgt. Wiles, discussed below, support the claim that the defendants were motivated, at least partially, by their concern about the negative reactions of the carriage riders and operators in response to the viewpoint of the protesters.

For instance, on November 2, 2019, Lt. Corbett indicated that if any counter-protesters appeared, they would be allowed to protest across the street from the loading zone, yet Saltz and his colleagues were prohibited from chanting at that spot.[15] *See* 11/2 Video 1 at 1:45, 5:20; *see Bible Believers*, 805 F.3d at 247-48 ("It is a fundamental precept of the First Amendment that the government cannot favor the rights of one private speaker over those of another.") (citing *Rosenberger*, 515 U.S. at 828); *see also Turner*, 512 U.S. at 643 ("[L]aws that by their terms distinguish favored speech from disfavored speech on the basis of the ideas or views expressed are content based."); *McGuire v. Reilly*, 386 F.3d 45, 48 (1st Cir. 2004) (explaining that a viewpoint discrimination claim can exist when the "government enforces the law against persons of one viewpoint who violate the statute while not enforcing the law against similarly situated

---

[15] Defendants correctly point out that there were no counter-protesters at either of the relevant protests. ECF 26 at 10. But, the location at which the officers planned to locate any counter-protesters is still relevant to this analysis.

persons of the opposing viewpoint who also violate the statute"). Therefore, in contrast to the buffer zone in *McCullen*, the restrictions here arguably turned on what the protesters were saying, not where they said it. 573 U.S. at 479.

And, on November 9, 2019, Sgt. Wiles explained that one of the reasons the protesters could not stand across the street from the loading zone "is that Mr. Lambert feels like he is being harassed when you are shouting outside the [designated First Amendment] zone." 11/9 Video 9 at 3:22. Further, Sgt. Wiles said that Saltz could not leaflet at the location of his choice because she was concerned about how the individuals waiting in line, with opposing viewpoints, would react to him. *See* 11/9 Video 11.

In the Motion, defendants concede that they were worried about listener reaction because of the content of the protesters' speech.  They state: "The only influence that the content of the protesters' speech has had is that it has caused the risk of violence to increase when the protesters are not separated from the riders at the carriage ride events." ECF 16-1 at 25. And, because of the risk of violence, the FPD designated a separate area for the protesters. ECF 16-1 at 19; *see* ECF 16-9 (Operations Plan); *see Rock for Life-UMBC*, 411 F. App'x at 553 (finding a heckler's veto was effectuated where individuals working at a state university denied plaintiff access to university facilities based only on a prediction or concern that plaintiff's planned event would lead to a hostile or violent reaction from a crowd). Defendants also note that "there can be no debate that the 'chanting'…from across the street…would be 'actually disruptive' to the Lamberts, as well as to their customers, as they engaged in their business." ECF 16-1 at 27.

As indicated, "[l]isteners' reaction to speech is not a content-neutral basis for regulation." *Forsyth Cty.*, 505 U.S. at 134.  When state action restricts constitutionally protected speech based on content, the Court must apply strict scrutiny to the restrictions. *Id.*  Therefore, the

defendants must prove that the challenged law is "narrowly tailored to achieve a compelling governmental interest." *Abrams v. Johnson*, 521 U.S. 74, 82 (1997); *see Consol. Edison Co. of New York v. Pub. Serv. Comm'n of New York*, 447 U.S. 530, 540 (1980).

To establish that a law or restriction regulating or restricting speech is narrowly tailored, "the Government carries the burden of showing that the challenged regulation advances the Government's [compelling] interest in a direct and material way." *Rubin v. Coors Brewing Co*., 514 U.S. 476, 487 (1995) (quotation omitted). And, a restriction is not narrowly tailored "if less restrictive alternatives would be at least as effective in achieving the legitimate purpose that the statute was enacted to serve." *Reno v. Am. Civil Liberties Union*, 521 U.S. 844, 874 (1997). Notably, "[p]unishing, removing, or by other means silencing a speaker due to crowd hostility will seldom, if ever, constitute the least restrictive means available to serve a legitimate government purpose." *Bible Believers*, 805 F.3d at 248 (citing *Gregory v. City of Chi*., 394 U.S. 111 (1969); *Cox v. Louisiana*, 379 U.S. 536 (1965); *Edwards*, 372 U.S. 229; *Terminiello v. City of Chi*., 337 U.S. 1 (1949); *Cantwell v. Connecticut*, 310 U.S. 296 (1940)).

Defendants argue, *inter alia*, that the restrictions could be justified under the captive audience doctrine. *See* ECF 16-1 at 31; ECF 26 at 17-18. "The notion of 'captive audience' involves the problem of the unwilling listener or viewer who cannot readily escape from the undesired communication, or whose own rights are such that he or she should not be required to do so." *Eanes*, 318 Md. at 451, 569 A.2d at 611; *see Hill v. Colorado*, 530 U.S. 703, 716-17 (2000). But, this doctrine is employed sparingly to a narrow set of fact scenarios outside of the home. *See Phelps*, 562 U.S. at 453 ("As a general matter, we have applied the captive audience doctrine only sparingly to protect unwilling listeners from protected speech.").

Public safety and crime prevention are compelling government interests for purposes of strict scrutiny analysis. *See United States v. Salerno*, 481 U.S. 739, 750 (1987) (noting that "the Government's general interest in preventing crime is compelling"); *Kolbe v. Hogan*, 849 F.3d 114, 139 (4th Cir. 2017) (en banc) (noting that a state's interest in "the protection of its citizenry and the public safety is not only substantial, but compelling"). "When clear and present danger of riot, disorder, interference with traffic upon the public streets, or other immediate threat to public safety, peace, or order, appears, the power of the state to prevent or punish is obvious." *Cantwell*, 310 U.S. at 308; *see Terminiello*, 337 U.S. at 4. And, given the history of confrontations at the earlier protests, there is no basis to question the legitimacy of defendants' concern for public safety or their power to enforce certain restrictions to serve that interest.

But, Frederick "bears the burden of showing that the remedy it has adopted does not 'burden substantially more speech than is necessary to further the government's legitimate interests.'" *Turner*, 512 U.S. at 665 (quoting *Ward*, 491 U.S. at 799). That burden is not "satisfied by mere recitation, for the court has an 'obligation to exercise independent judgment' when reviewing the government's justification for a regulation on speech." *Clatterbuck v. City of Charlottesville*, 92 F. Supp. 3d 478, 487 (W.D. Va. 2015) (quoting *Turner*, 512 U.S. at 666).

Plaintiff contends that defendants have "not proved with evidence that they tried less restrictive means to serve the claimed interests." ECF 21 at 33; *see also id.* at 21, 36, 41, 44. And, Saltz suggests other restrictions that could have been less burdensome but just as effective. *Id.* For instance, Saltz claims that defendants could have moved the "line of riders down the block – which they did and would seem to be sufficient – while allowing protesters across the street to chant and speak against carriage rides." *Id.* Further, as to the leafletting, Saltz alleges

that the "isolated, minor ride-connected incident" where a "protester was spat" on by one of the riders "did not permit the restriction" on leafletting. *Id.* at 41-42.

In my view, defendants have not met their burden to establish that the means employed were the *least restrictive* means to achieve their interests. Indeed, they devote a considerable portion of their argument to the matter of intermediate scrutiny, without focusing on the facts that apply in the event the Court were to determine that strict scrutiny is appropriate.  Rather, defendants merely state in broad, conclusory terms that the restrictions satisfy strict scrutiny because they were "narrowly tailored to serve compelling government interests and left alternative forums for communication." ECF 16-1 at 33-34. But, they do not provide evidence substantiating the need for the chosen restrictions to protect the peace, the efficacy of the restrictions, or issues with less restrictive alternatives. *See Playboy Entm't Grp.*, 529 U.S. at 816 ("When a plausible, less restrictive alternative is offered to a content-based speech restriction, it is the Government's obligation to prove that the alternative will be ineffective to achieve its goals.").

Although the restrictions on Saltz were minimal in comparison to those in analogous cases, "[a] tax based on the content of speech does not become more constitutional because it is a small tax." *Forsyth*, 505 U.S. at 136. As I see it, defendants have not met their burden as to the least restrictive means employed.  Based on the record before me, I cannot conclude, as a matter of law, that plaintiff's rights under the First Amendment were not violated.

To be sure, it is far from clear that strict scrutiny review would fail if defendants fleshed out the basis for the restrictions. *See, e.g., Williams-Yulee v. The Florida Bar*, 575 U.S. 433, 445 (2015) (noting that the strict scrutiny is not "fatal in fact") (quoting *Adarand Constructors, Inc. v. Pena*, 515 U.S. 200, 237 (1995)). But, they have not adequately done so.

#### 4. Qualified Immunity

Defendants argue that, even if Saltz has adequately stated a claim against the individual defendants, summary judgment is nonetheless warranted on grounds of qualified immunity.

"Qualified immunity bars § 1983 actions against government officials in their individual capacities 'unless (1) they violated a federal statutory or constitutional right, and (2) the unlawfulness of their conduct was clearly established at the time.'" *Barrett v. PAE Government Services, Inc.*, 975 F.3d 416, 428 (4th Cir. 2020) (quoting *District of Columbia v. Wesby*, ___ U.S. ___, 138 S. Ct. 577, 589 (2018)) (cleaned up); *see also Halcomb v. Ravenell*, 992 F.3d 316, 319 (4th Cir. 2021); *Humbert v. Mayor and City Council of Balt.*, 866 F.3d 546, 555 (4th Cir. 2017), *cert. denied*, ___ U.S. ___, 138 S. Ct. 2602 (2018); *Osborne v. Georgiades*, 679 F. App'x 234, 237 (4th Cir. 2017); *Scinto v. Stansberry*, 841 F.3d 219, 235 (4th Cir. 2016); *Hunter v. Town of Mocksville*, 789 F.3d 389, 401 (4th Cir. 2015). In *Owens*, 767 F.3d at 395, the Fourth Circuit reiterated: "Qualified immunity protects government officials from liability for 'civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" (Quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).

The doctrine of qualified immunity "balances two important interests—the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009); *see also Barrett*, 975 F.3d at 428-29; *Betton v. Belue*, 942 F.3d 184, 190 (4th Cir. 2019); *Wilson v. Prince George's Cty.*, 893 F.3d 213, 219 (4th Cir. 2018); *Smith v. Ray*, 781 F.3d 95, 100 (4th Cir. 2015). The cases are legion in support of these principles. *See, e.g., Wesby*, 137 S. Ct. at 589; *Reichle v. Howards*, 566 U.S. 658, 664

(2012); *Saucier v. Katz*, 533 U.S. 194, 206 (2001); *Robertson*, 989 F.3d at 288; *Ray v. Roane*, 948 F.3d 222, 229-30 (4th Cir. 2020); *Hupp v. Cook*, 931 F.3d 307, 317 (4th Cir. 2019); *Attkisson v. Holder*, 925 F.3d 606, 623 (4th Cir. 2019); *Williamson v. Stirling*, 912 F.3d 154, 186 (4th Cir. 2018); *Wilson*, 893 F.3d at 219; *Sims v. Labowitz*, 885 F.3d 254, 260 (4th Cir. 2018); *Spivey v. Norris*, 731 F. App'x 171, 175 (4th Cir. 2018); *O'Neal v. Rollyson*, 729 F. App'x 254, 255 (4th Cir. 2018) (per curiam); *Crouse v. Town of Moncks Corner*, 848 F.3d 576, 582-83 (4th Cir. 2017); *Occupy Columbia v. Haley*, 738 F.3d 107, 118 (4th Cir. 2013); *Bland v. Roberts*, 730 F.3d 368, 391 (4th Cir. 2013); *Merchant v. Bauer*, 677 F.3d 656, 661 (4th Cir. 2012), *cert. denied*, 568 U.S. 1068 (2012).

Qualified immunity turns on the "objective reasonableness of an official's conduct, as measured by reference to clearly established law." *Harlow*, 457 U.S. at 818.  An officer who makes an honest but objectively unreasonable mistake is not protected by qualified immunity. Rather, the doctrine protects officials "'who commit constitutional violations but who, in light of clearly established law, could reasonably believe that their actions were lawful.'"  *Williams v. Ozmint*, 716 F.3d 801, 805 (4th Cir. 2013) (citation omitted); *accord Durham v. Horner*, 690 F.3d 183, 188 (4th Cir. 2012).

Qualified immunity "'gives government officials breathing room to make reasonable but mistaken judgments about open legal questions.'"  *Lane v. Franks*, 573 U.S. 228, 243 (2014) (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 743 (2011)); *accord Robertson*, 989 F.3d at 288 ("'[I]n gray areas, where the law is unsettled or murky, qualified immunity affords protection to' government officials who take 'action[s] that [are] not clearly forbidden.'") (quoting *Occupy Columbia*, 738 F.3d at 118); *Brawn v. Maynard*, 652 F.3d 557, 560 (4th Cir. 2011) (observing that qualified immunity protects government officials from liability for "'bad guesses in gray

areas'") (citation omitted).  In other words, "[t]he qualified immunity standard 'gives ample room for mistaken judgments' by protecting 'all but the plainly incompetent or those who knowingly violate the law.'"  *Hunter v. Bryant*, 502 U.S. 224, 229 (1991) (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)); *accord Stanton v. Sims*, 571 U.S. 3, 5-6 (2013) (per curiam).

Thus, "even when the facts in the record establish that the officer's conduct violated a plaintiff's constitutional rights, the officer still is entitled to immunity from suit 'if a reasonable person in the [officer's] position could have failed to appreciate that his conduct would violate those rights.'"  *Wilson*, 893 F.3d at 219 (quoting *Torchinsky v. Siwinski*, 942 F.2d 257, 261 (4th Cir. 1991)); *see also Williams v. Strickland*, 917 F.3d 763, 768 (4th Cir. 2019); *Greene v. Feaster*, 733 F. App'x 80, 82 (4th Cir. 2018) (per curiam) ("Even when a prison official [is shown to have violated a constitutional right of a plaintiff], qualified immunity will shield him from liability as long as his 'conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'") (quoting *Goines*, 822 F.3d at 170).

Notably, "a government official who is sued in his individual capacity may invoke qualified immunity."  *Bland*, 730 F.3d at 391; *see Harlow*, 457 U.S. at 818.  Moreover, "[t]he protection of qualified immunity applies regardless of whether the government official's error is 'a mistake of law, a mistake of fact, or a mistake based on mixed questions of law and fact.'"  *Pearson*, 555 U.S. at 231.

Of relevance here, qualified immunity is an "'*immunity from suit* rather than a mere defense to liability[.]'"  *Ussery v. Mansfield*, 786 F.3d 332, 337 (4th Cir. 2015) (quoting *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985)) (emphasis in *Mitchell*).  Accordingly, the immunity is "'effectively lost if a case is erroneously permitted to go to trial.'"  *Ussery*, 786 F.3d at 337

(quoting *Mitchell*, 472 U.S. at 526).   However, "[b]ecause an official 'who performs an act clearly established to be beyond the scope of his discretionary authority is not entitled to claim qualified immunity,' the defendant bears the initial burden 'of demonstrating that the conduct of which the plaintiff complains falls within the scope of the defendant's duties.'"   *Henry v. Purnell*, 501 F.3d, 374, 377 n.2 (4th Cir. 2007) (citation omitted).

The Fourth Circuit has explained: "In determining whether defendant government officials are protected by qualified immunity, the court considers both 'whether a constitutional right [was] violated on the facts alleged' and 'whether the right was clearly established' at the time of the conduct in question."   *Scinto*, 841 F.3d at 235 (citations omitted); *see also Cannon v. Village of Bald Head Island*, 891 F.3d 489, 497 (4th Cir. 2018).   Thus, the qualified immunity analysis involves two inquiries: (1) whether the facts alleged, "[t]aken in the light most favorable to the party asserting the injury, . . . show the officer's conduct violated a constitutional [or statutory] right," *Saucier*, 533 U.S. at 201; and (2) whether the right at issue "'was clearly established in the specific context of the case—that is, [whether] it was clear to a reasonable officer that the conduct in which he allegedly engaged was unlawful in the situation he confronted.'"   *Merchant*, 677 F.3d at 662 (quoting *Figg v. Schroeder*, 312 F.3d 625, 635 (4th Cir. 2002)); *see Wesby*, 138 S. Ct. at 589; *Ray*, 948 F.3d at 226; *Owens,* 767 F.3d at 395-96.

The "two inquiries . . . may be assessed in either sequence."   *Merchant*, 677 F.3d at 661-62; *accord Ray*, 948 F.3d at 226; *Labowitz*, 885 F.3d at 260; *Adams v. Ferguson*, 884 F.3d 219, 226 (4th Cir. 2018). "The plaintiff bears the burden of proof on the first question—i.e., whether a constitutional violation occurred .... [and] [t]he defendant bears the burden of proof on the second question—i.e., entitlement to qualified immunity." *Henry*, 501 F.3d at 377–78 (internal citations omitted).

47

If an officer is shown to have violated the rights of a plaintiff, courts must then "evaluate whether the right at issue was 'clearly established' at the time of the officer's conduct." *Wilson*, 893 F.3d at 219.  This is a question of law for the court to resolve.  *Ray*, 948 F.3d at 228; *Pritchett v. Alford*, 973 F.2d 307, 312 (4th Cir. 1992).  The second inquiry "turns on the 'objective legal reasonableness' of the action, assessed in light of the legal rules that were 'clearly established' at the time it was taken." *Messerschmidt v. Millender*, 565 U.S. 535, 546 (2012) (citing *Anderson v. Creighton*, 483 U.S. 635, 639 (1987)).

If the law at the time of the alleged violation was not "clearly established," the official will be entitled to qualified immunity because "an official could not reasonably be expected to anticipate subsequent legal developments, nor could he fairly be said to 'know' that the law forbade conduct not previously identified as unlawful." *Harlow*, 457 U.S. at 818.  On the other hand, "[i]f the law was clearly established, the immunity defense ordinarily should fail, since a reasonably competent public official should know the law governing his conduct." *Id.* at 818-19.

To determine whether the right was clearly established, the court first must define the right at issue.  *Scinto*, 841 F.3d at 235; *see Occupy Columbia*, 738 F.3d at 118.  "A right is clearly established only if its contours are sufficiently clear that 'a reasonable official would understand that what he is doing violates that right.'" *Carroll v. Carman*, 574 U.S. 13, 16 (2014) (quoting *Creighton*, 483 U.S. at 640).  Notably, "a right may be clearly established by any number of sources, including a . . . case, a statute, or the Constitution itself." *Owens,* 767 F.3d at 399; *see Booker v. S.C. Dep't of Corr.*, 855 F.3d 533, 543 (4th Cir. 2017).

Generally, to "determine whether a right is clearly established," courts "assess whether the law has 'been authoritatively decided by the Supreme Court,[] the appropriate United States Court of Appeals, or the highest court of the state.'" *Wilson*, 893 F.3d at 221 (citation omitted);

*see Doe ex rel. Johnson v. S.C. Dep't of Soc. Servs.,* 597 F.3d 163, 176 (4th Cir. 2010) (stating that "'ordinarily [courts] need not look beyond the decisions of the Supreme Court, [the Fourth Circuit], and the highest court of the state in which the case arose'" as of the date of the conduct at issue), *cert. denied*, 562 U.S. 890 (2010).  "In other words, 'existing precedent must have placed the statutory or constitutional question beyond debate.'"  *Carroll*, 574 U.S. at 16-17 (quoting *al-Kidd*, 563 U.S. at 741); *see Kisela v. Hughes*, ___ U.S. ___, 138 S. Ct. 1148, 1152 (2018); *White v. Pauly,* ___ U.S. ___, 137 S. Ct. 548, 551 (2017) (per curiam); *San Francisco v. Sheehan*,  575 U.S. 600, 611 (2015); *Plumhoff v. Rickard*, 572 U.S. 765, 778-79 (2014); *see also Reichle*, 566 U.S. at 664 ("To be clearly established, a right must be sufficiently clear that 'every reasonable official would [have understood] that what he is doing violates that right.'") (citation and some quotation marks omitted).

However, "[a] right need not be recognized by a court in a specific factual context before such right may be considered 'clearly established' for purposes of qualified immunity." *Wilson*, 893 F.3d at 221; *see Thompson v. Virginia*, 878 F.3d 89, 98 (4th Cir. 2017) ("[A] 'general constitutional rule . . . may apply with obvious clarity . . . even though the very action in question has not previously been held unlawful.'") (quoting *Hope v. Pelzer*, 536 U.S. 730, 741 (2002)); *Booker v. S.C. Dep't of Corr.*, 855 F.3d 533, 544 (4th Cir. 2017).  Indeed, the Supreme Court has never required a "'case directly on point for a right to be clearly established.'"  *Kisela*, 138 S. Ct. at 1152 (quoting *White*, 137 S. Ct. at 551); *see al-Kidd*, 563 U.S. at 741; *see also Crouse*, 848 F.3d, at 582-83. Thus, "even without 'directly on-point, binding authority,' qualified immunity is inappropriate if 'the right was clearly established based on general constitutional principles or a consensus of persuasive authority.'" *Ray*, 948 F.3d at 229-30 (quoting *Booker*, 855 F.3d at 543).

But, "courts are 'not to define clearly established law at a high level of generality.'"

*Wilson*, 893 F.3d at 221 (quoting *Kisela*, 138 S. Ct. at 1152); *see also Sheehan*, 135 S. Ct. at 1775-76; *Plumhoff*, 572 U.S. at 779.  Rather, courts are to "consider whether a right is clearly established 'in light of the specific context of the case, not as a broad general proposition.'" *Adams*, 884 F.3d at 227 (quoting *Mullenix v. Luna*, 577 U.S. 7, 12 (2015) (per curiam)).

The central question is "whether it would be clear to a reasonable official that his conduct was unlawful in the situation he confronted."  *See Raub v. Campbell*, 785 F.3d 876, 882 (4th Cir. 2015).  To defeat qualified immunity, "'the existing authority must be such that the unlawfulness of the conduct is manifest.'"  *Merchant*, 677 F.3d at 665 (quoting *Wilson v. Layne*, 141 F.3d 111, 114 (4th Cir. 1998)); *see Bland*, 730 F.3d at 391 (stating that "[f]or a plaintiff to defeat a claim of qualified immunity, the contours of the constitutional right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right") (internal quotations omitted).

Of relevance here, at summary judgment, "a court, when viewing facts in the light most favorable to the plaintiff, and drawing all reasonable inferences in the plaintiff's favor, must determine whether defendant is entitled to qualified immunity." *Dean for & on behalf of Harkness v. McKinney*, 976 F.3d 407, 413 (4th Cir. 2020) (citing *Williams v. Strickland*, 917 F.3d 763, 768 (4th Cir. 2019)); *see Brown v. Elliott*, 876 F.3d 637, 641–42 (4th Cir. 2017) ("[W]hen resolving the issue of qualified immunity at summary judgment, a court must ascertain the circumstances of the case by crediting the plaintiff's evidence and drawing all reasonable inferences in the plaintiff's favor.") (internal quotation marks omitted).

Defendants assert that the individual defendants are entitled to qualified immunity because "their conduct did not violate clearly established law." ECF 16-1 at 37. They assert that they were following what "they reasonably believed to be a valid General Order and valid

Operations Plan. *Id.* at 38. And, there was "nothing to indicate that" the defendants "had reason to know" that restricting Saltz from chanting across the street from the riders or leafletting them would infringe his "clearly established rights." *Id.* But, beyond that, defendants have not argued with any particularity why the alleged constitutional rights were not clearly established at the time they occurred. Nor do they make clear that an objectively reasonable person would not have known that the actions violated an established right.

As detailed above, it is well established that content-based discrimination is a violation of a clearly established constitutional right unless the restrictions are narrowly tailored to serve a compelling government interest. *Cf. Rock for* Life, 411 F. App'x at 555 ("In the abstract, at least, the impermissibility of a heckler's veto is clearly established by First Amendment jurisprudence."). And, the question remains unresolved as to the narrow tailoring of the restrictions and thus the constitutionality of the restrictions imposed on Saltz. Accordingly, at this juncture, defendants are not entitled to qualified immunity. *Cf. Child. First Found., Inc. v. Legreide*, 373 F. App'x 156, 160 (3d Cir. 2010) (declining to find qualified immunity when plaintiff made a plausible claim of viewpoint discrimination).

### 5. Supervisory Liability

In addition to their qualified immunity defense, defendants argue that there "are no grounds to find supervisory liability of either Chief Hargis or Captain Sommers." ECF 26 at 23.

As noted earlier, under § 1983, there is no respondeat superior liability. *Iqbal*, 556 U.S. at 676; *Love-Lane*, 355 F.3d at 782. The plaintiff must show personal fault based on personal conduct. *See Vinnedge*, 550 F.3d at 928. And, the Fourth Circuit has stated: "A supervisor can only be held liable for the failings of a subordinate under certain narrow circumstances." *Green v. Beck*, 539 F. App'x 78, 80 (4th Cir. 2013); *see Slakan v. Porter*, 737 F.2d 368, 373 (4th Cir.

1984) ("[S]upervisory officials may be held liable in certain circumstances for the constitutional injuries inflicted by their subordinates.").

Liability of supervisory officials under § 1983 "is premised on 'a recognition that supervisory indifference or tacit authorization of subordinates' misconduct may be a causative factor in the constitutional injuries they inflict on those committed to their care.'" *Baynard v. Malone*, 268 F.3d 228, 235 (4th Cir. 2001) (citing *Slakan*, 737 F.2d at 372); *see Campbell v. Florian*, 972 F.3d 385, 398 (4th Cir. 2020). With respect to a supervisory liability claim in a § 1983 action, a plaintiff must allege, *Shaw v. Stroud*, 13 F.3d 791, 799 (4th Cir. 1994) (citations omitted), *cert. denied*, 513 U.S. 813 (1994):

> (1) That the supervisor had actual or constructive knowledge that his subordinate was engaged in conduct that posed a pervasive and unreasonable risk of constitutional injury to ... the plaintiff; (2) that the supervisor's response to that knowledge was so inadequate as to show deliberate indifference to or tacit authorization of the alleged offensive practices; and (3) that there was an affirmative causal link between the supervisor's inaction and the particular constitutional injury suffered by the plaintiff.

To qualify as "pervasive," a plaintiff must demonstrate that the challenged "conduct is widespread, or at least has [occurred] on several different occasions." *Id.* It is not sufficient, therefore, to "point[ ] to a single incident or isolated incidents, for a supervisor cannot be expected to promulgate rules and procedures covering every conceivable occurrence" or "guard against the deliberate criminal acts of his properly trained employees when he has no basis upon which to anticipate the misconduct." *Id.* (quoting *Slakan*, 737 F.2d at 373). But, a supervisor's "continued inaction in the face of documented widespread abuses . . . provides an independent basis" for § 1983 liability against that official for his or her deliberate indifference or acquiescence to "the constitutionally offensive conduct of his subordinates." *Slakan*, 737 F.2d at 373; *see Shaw*, 13 F.3d at 799.

Here, the Amended Complaint contains no allegations that Chief Hargis personally participated in the events underlying Saltz's claims or was even aware of them. Further, Saltz does not claim that there were other examples of First Amendment violations of which Hargis was aware but failed to act. And, none of the evidence in the record establishes Hargis's involvement during either of the protests. Thus, the allegations do not support a claim of supervisory liability on the part of Hargis.

As to Capt. Sommers, Saltz argues that even if Sommers was not present at the protest, he was aware of what was happening, was in command remotely, and directed the actions against Saltz. ECF 21 at 46; *see* ECF 12, ¶¶ 38, 40, 42. Indeed, on November 9, 2019, Sgt. Wiles repeatedly explained that she was giving orders from Capt. Sommers. *See, e.g.,* ECF 12, ¶ 40; 11/9 Video 9. In the light most favorable to plaintiff, this indicates that Capt. Sommers was aware of what was happening on the ground, was in communication with the officers, and authorized their actions. At this juncture, this is sufficient to establish that Capt. Sommers was personally involved in the alleged violations of plaintiff's rights during the protests.

Accordingly, I shall dismiss Counts 2 and 4 as to Chief Hargis. But, I shall deny the Motion as to Capt. Sommers.

### B.  *Monell* Claims (Counts 1 and 3)

In Counts 1 and 3, plaintiff brings *Monell* claims against the City under three theories of liability. First, he alleges that the officers acted pursuant to deficient policies that were "implemented, ratified, and approved" by "policymakers and final decisionmakers" for the City. ECF 12, ¶¶ 15, 16. Second, plaintiff alleges that the FPD condoned a custom of "deliberate indifference toward the First Amendment rights of protesters and leafletters." *Id.* ¶ 50. Third,

plaintiff claims that the FPD failed adequately to train officers "in basic, well-known, and commonly-occurring First Amendment situations[.]" *Id.* ¶ 47.

Defendants have moved to dismiss both counts, asserting that Amended Complaint alleges "no final policymaking actions which might subject the City to liability for an unconstitutional policy." ECF 16-1 at 36.

As discussed, *supra*, the Court shall assess plaintiff's *Monell* claims under the Rule 12(b)(6) motion to dismiss standard.

### 1.   *Monell* Generally

The Supreme Court determined in *Monell*, 436 U.S. 658, that local governmental bodies may be liable under § 1983 based on the unconstitutional actions of individual defendants, but only where those defendants were executing an official policy or custom of the local government resulting in a violation of the plaintiff's rights. *Id.* at 690-91.  The *Monell* Court explained that, "when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury the government as an entity is responsible under § 1983." *Id.* at 694; *see Love-Lane*, 355 F.3d at 782.  But, liability attaches "only where the municipality itself causes the constitutional violation at issue." *City of Canton v. Harris*, 489 U.S. 378, 385 (1989) (emphasis in original); *accord Holloman v. Markowski*, 661 Fed. App'x 797, 799 (4th Cir. 2016) (per curiam), *cert. denied*, ___U.S. ___, 137 S. Ct. 1342 (2017).

In *Connick v. Thompson*, 563 U.S. 51, 60 (2011), the Supreme Court explained (emphasis in *Connick*):

> A municipality or other local government may be liable under [§ 1983] if the governmental body itself "subjects" a person to a deprivation of rights or "causes" a person "to be subjected" to such deprivation. *See Monell v. New York City Dep't of Social Servs.*, 436 U.S. 658, 692, 98 S. Ct. 2018, 56 L.Ed.2d 611 (1978). But,

under § 1983, local governments are responsible only for "their *own* illegal acts." *Pembaur v. Cincinnati*, 475 U.S. 469, 479, 106 S. Ct. 1292, 89 L.Ed.2d 452 (1986) (citing *Monell*, 436 U.S. at 665-683, 98 S. Ct. 2018). They are not vicariously liable under § 1983 for their employees' actions. *See id.*, at 691, 98 S. Ct. 2018; *Canton*, 489 U.S. at 392, 109 S. Ct. 1197; *Board of Comm'rs of Bryan Cty. v. Brown*, 520 U.S. 397, 403, 117 S. Ct. 1382, 137 L.Ed.2d 626 [] (1997) (collecting cases).

Thus, a viable § 1983 *Monell* claim consists of two components: (1) the municipality had an unconstitutional policy or custom; and (2) the unconstitutional policy or custom caused a violation of the plaintiff's constitutional rights. *See, e.g.*, *Bd. of Comm'rs of Bryan Cty. v. Brown*, 520 U.S. 397, 403 (1997); *Kirby v. City of Elizabeth City*, 388 F.3d 440, 451 (4th Cir. 2004), *cert. denied*, 547 U.S. 1187 (2006); *Lytle v. Doyle*, 326 F.3d 463, 471 (4th Cir. 2003).

However, a municipality cannot be held liable in a § 1983 action under a theory of respondeat superior. *Monell*, 436 U.S. at 693-94. Rather, "[i]t is well established that in a § 1983 case a city or other local governmental entity cannot be subject to liability at all unless the harm was caused in the implementation of 'official municipal policy.'" *Lozman v. City of Riviera Beach*, ___ U.S. ___, ___, 138 S. Ct. 1945, 1951 (2018) (citation omitted); *see Milligan v. City of Newport News*, 743 F.2d 227, 229 (4th Cir. 1984). In other words, a municipality is liable when a "policy or custom" is "fairly attributable to the municipality as its 'own,' and is . . . the 'moving force' behind the particular constitutional violation." *Spell v. McDaniel*, 824 F.2d 1380, 1387 (4th Cir. 1987) (internal citations omitted).

A plaintiff may demonstrate the existence of an official policy in three ways: (1) a written ordinance or regulation; (2) certain affirmative decisions of policymaking officials; or (3) in certain omissions made by policymaking officials that "manifest deliberate indifference to the rights of citizens." *Carter v. Morris*, 164 F.3d 215, 218 (4th Cir. 1999). "Locating a 'policy' ensures that a municipality is held liable only for those deprivations resulting from the decisions

55

of its duly constituted legislative body or of those officials whose acts may fairly be said to be those of the municipality." *Bd. of Comm'rs of Bryan Cty.*, 520 U.S. at 403-04.

"An official policy often refers to 'formal rules or understandings . . . that are intended to, and do, establish fixed plans of action to be followed under similar circumstances consistently and over time,' and must be contrasted with 'episodic exercises of discretion in the operational details of government.'" *Semple v. City of Moundsville*, 195 F.3d 708, 712 (4th Cir. 1999) (alteration in *Semple*; citations omitted). In addition, as discussed, *infra*, "the governmental unit may create an official policy by making a single decision regarding a course of action in response to particular circumstances." *Id.*

Notably, "[o]utside of such formal decisionmaking channels, a municipal custom may arise if a practice is so 'persistent and widespread' and 'so permanent and well settled as to constitute a "custom or usage" with the force of law.'" *Carter*, 164 F.3d at 218 (quoting *Monell*, 436 U.S. at 691); *see Simms ex rel. Simms v. Hardesty*, 303 F. Supp. 2d 656, 670 (D. Md. 2003). A policy or custom "may be attributed to a municipality when the duration and frequency of the practices warrants a finding of either actual or constructive knowledge by the municipal governing body that the practices have become customary among its employees." *Spell*, 824 F.2d at 1387; *see Holloman*, 661 Fed. App'x at 799. In addition, "a policy or custom may possibly be inferred from continued inaction in the face of a known history of widespread constitutional deprivations on the part of city employees, or, under quite narrow circumstances, from the manifest propensity of a general, known course of employee conduct to cause constitutional deprivations to an identifiable group of persons having a special relationship to the state." *Milligan*, 743 F.2d at 229 (internal citations omitted).

In *Owens*, 767 F.3d at 402, the Fourth Circuit reiterated that, to establish a *Monell* claim, the plaintiff "must point to a 'persistent and widespread practice[] of municipal officials,' the 'duration and frequency' of which indicate that policymakers (1) had actual or constructive knowledge of the conduct, and (2) failed to correct it due to their 'deliberate indifference.'" (Quoting *Spell*, 824 F.2d at 1386-91) (alteration in *Owens*). Therefore, "Section 1983 plaintiffs seeking to impose liability on a municipality must . . . adequately plead and prove the existence of an official policy or custom that is fairly attributable to the municipality and that proximately caused the deprivation of their rights." *Jordan by Jordan v. Jackson*, 15 F.3d 333, 338 (4th Cir. 1994).

A policy or custom that gives rise to § 1983 liability will not, however, "be inferred merely from municipal inaction in the face of isolated constitutional deprivations by municipal employees." *Milligan*, 743 F.2d at 230. Only when a municipality's conduct demonstrates a "deliberate indifference" to the rights of its inhabitants can the conduct be properly thought of as a "policy or custom" actionable under § 1983. *Jones v. Wellham*, 104 F.3d 620, 626 (4th Cir. 1997) (citing *Canton*, 489 U.S. at 389).

## 2. Official Policy

In support of his *Monell* claim, Saltz alleges that there were two policies—the General Order and the Operations Plan—that were "obviously deficient in guiding officers on basic concepts and commonly-occurring situations." ECF 12, ¶ 20. In particular, he claims that the policies did not address "common and fundamental concepts" addressed in First Amendment cases, such as those regarding leafletting, content-neutrality, and "unreasonably loud noise." *Id.* ¶ 26; *id.* ¶ 30. Saltz also claims that the General Order is flawed in that it "does not inform officers that leafletters differ from protestors" and "should be able to engage with people who might

57

disagree with them." *Id.* ¶¶ 23, 24. And, he alleges that Hargis was a "policymaker[]" and "final decisionmaker[]" for the City and "implemented, ratified, and approved policies regarding protesters and leafletters," including the General Order and Operations Plan. *Id.* ¶¶ 15, 16.

As indicated, a policy may be created "by making a single decision regarding a course of action in response to particular circumstances." *Semple*, 195 F.3d at 712. In other words, "'municipal liability may be imposed for a single decision by municipal policymakers under appropriate circumstances.'" *Hunter*, 897 F.3d at 554 (quoting *Pembaur v. City of Cincinnati*, 475 U.S. 469, 480 (1986)).  Of relevance here, although an "official policy" is often a formal rule committed to writing, "the concept 'of official policy' for purposes of Section 1983 extends beyond formal ordinances and policies" to include ad hoc policy choices and decisions.  *Hunter*, 897 F.3d at 554; *accord Spell*, 824 F.2d at 1385 (explaining that a municipal policy can be found "in formal or informal *ad hoc* 'policy' choices or decisions of municipal officials authorized to make and implement municipal policy").

However, municipal liability based on this theory "'attaches only where the decisionmaker possesses final authority to establish municipal policy with respect to the action ordered.'" *Lane v. Anderson*, 660 F. App'x 185, 197 (4th Cir. 2016) (quoting *Pembaur*, 475 U.S. at 479). In order to qualify as a "final policy making official," the "'municipal official must have the responsibility and authority to implement final municipal policy with respect to a particular course of action.'" *Lane*, 660 F. App'x at 197 (quoting *Riddick v. Sch. Bd. of Portsmouth*, 238 F.3d 518, 523 (4th Cir. 2000)). "'The question of who possesses final policymaking authority is one of state law.'" *Hunter*, 897 F.3d at 555 (quoting *Riddick*, 238 F.3d at 523).

Defendants argue that "neither [of the policies] fails to give fair notice of the conduct it prohibits or invites arbitrary enforcement, and neither one is required to specify alleged 'commonly-recurring situations.'" ECF 26 at 24 (citing *Kolbe*, 849 F.3d at 148). Therefore, according to defendants, plaintiff's argument that the policies are "unconstitutionally overbroad and vague on their face" fail, and he does not adequately allege a *Monell* claim. *Id.* at 23-24.

However, defendants mischaracterize plaintiff's claim and foist an unreasonable pleading standard upon him. Plaintiff need not allege that the policies, on their face, are unconstitutionally overbroad or vague. Rather, plaintiff alleges that policymakers at the FPD established two deficient policies that resulted in a violation of his First Amendment rights. At this stage of the litigation, these allegations are sufficient to put the City on notice of the nature of the claims against it and to allow it to prepare an adequate defense.

In the context of *Monell* liability, it will often be the case that a plaintiff lacks specific details regarding the municipal actor's internal policies and training procedures before discovery. Although boilerplate allegations will not suffice, at the motion to dismiss stage, courts should not expect the plaintiff to possess a rich set of facts concerning the allegedly unconstitutional policy and the responsible policymakers. *See Ulloa v. Prince George's Cty*., DKC 15-0257, 2015 WL 7878956, at *6 (D. Md. Dec. 4, 2015) (requiring that the plaintiff "pair *general* averments of a policy or custom with particular examples" to state a *Monell* claim) (emphasis added); *see also Estate of Osuna v. Cty. of Stanislaus*, 392 F. Supp. 3d 1162, 1174 (E.D. Cal. 2019) ("[T]the details of the alleged policy or custom . . . is a topic properly left to development through discovery.  It is a rare plaintiff who will have access to the precise contours of a policy or custom prior to having engaged in discovery, and requiring a plaintiff to plead its existence in detail is

59

likely to be no more than an exercise in educated guesswork."). Therefore, although the *Monell* claim based on an official policy may not ultimately prevail, it survives at this juncture.

In contrast, and as discussed, *infra*, plaintiff's allegations as to custom and training do not pass muster.

### 3.   Condonation Theory

Under the condonation theory of liability, "a city violates § 1983 if municipal policymakers fail 'to put a stop to or correct a widespread pattern of unconstitutional conduct.'" *Owens*, 767 F.3d at 402 (quoting *Spell*, 824 F.2d at 1389).   To assert a plausible claim, a plaintiff must allege "a 'persistent and widespread practice[] of municipal officials,' the 'duration and frequency' of which indicate that policymakers (1) had actual or constructive knowledge of the conduct, and (2) failed to correct it due to their 'deliberate indifference.'"   *Owens*, 767 F.3d at 402 (quoting Spell, 824 F.2d at 1386-1391).   Both "knowledge and indifference can be inferred from the 'extent' of employees' misconduct."   *Owens*, 767 F.3d at 402-03 (quoting *Spell*, 824 F.2d at 1391).   However, only "'widespread or flagrant'" misconduct is sufficient.   *Owens*, 767 F.3d at 403 (quoting *Spell*, 824 F.2d at 1387).   In contrast, "[s]poradic or isolated" misconduct is not.   *Owens*, 767 F.3d at 403.

*Owens*, 767 F.3d 379, is illustrative.   Owens brought a § 1983 claim against the Baltimore Police Department ("BPD"), several BPD officers, the Baltimore City State's Attorney's Office, and an assistant State's Attorney, alleging, *inter alia*, that the BPD "'maintained a custom, policy, and/or practice' of condoning its officers' conduct in 'knowingly, consciously, and repeatedly with[holding] and suppress[ing]' exculpatory evidence."   *Id.* at 402 (quoting the complaint).   The district court granted the defendants' motion to dismiss and Owens appealed.   The Fourth Circuit reversed.   *Id.* at 404.

As relevant here, the Fourth Circuit scrutinized Owens's complaint to determine whether it alleged a plausible condonation claim.  The Court observed, *id.* at 403 (alterations in original):

> In support of his claim, Owens alleges that "[r]eported and unreported cases from the period of time before and during the events complained of" establish that the BCPD had a custom, policy, or practice of knowingly and repeatedly suppressing exculpatory evidence in criminal prosecutions. He further alleges that "a number of motions were filed and granted during this time period that demonstrate that [the BCPD] maintained a custom, policy, or practice to allow this type of behavior either directly or . . . by condoning it, and/or knowingly turning a blind eye to it."

According to the Court, "[t]he assertions as to 'reported and unreported cases' and numerous 'successful motions' are factual allegations, the veracity of which could plausibly support a *Monell* claim."  *Id.*  Further, Owens's allegation that the BPD officers withheld exculpatory information "on multiple occasions could establish a 'persistent and widespread' pattern of practice, the hallmark of an impermissible custom."  *Id.* (quoting *Spell*, 824 F.2d at 1386).  Thus, the Court ruled that the complaint contained sufficient allegations to support a *Monell* claim premised on a condonation theory of liability.  *Id.* at 404.

Here, as described, the Amended Complaint identifies three examples of allegedly unconstitutional incidents on two dates: 1) the restriction on chanting on November 2, 2019; 2) the restriction on chanting on November 9, 2019; and 3) the restriction on leafletting on November 9, 2019. However, in contrast to *Owens*, plaintiff does not point to any incidents before, during, or after these events to demonstrate the existence of a pattern or custom.

These three examples, on their own, are not nearly sufficient to illustrate a "widespread and permanent practice necessary to establish municipal custom." *Carter*, 164 F.3d at 220 (stating that "meager history of isolated incidents" does not approach the "widespread and permanent practice necessary to establish municipal custom"); *see Owens*, 767 F.3d at 403; *Peters v. City of Mount Ranier*, GJH-14-00955, 2014 WL 4855032, at *6 (D. Md. Sept. 29,

2014) (concluding that "three solitary examples" of false arrests were "insufficient, as a matter of law, to demonstrate this existence of an official municipal custom or policy"); *McDonnell v. Hewitt-Angleberger*, WMN-11-3284, 2012 WL 1378636, at *3 (D. Md. Apr. 9, 2012) ("[T]he existence of a total of three isolated incidents (including Plaintiff's incident) does not demonstrate sufficient duration or frequency to impute constructive knowledge of a custom of brutality to the County.").

### 4.   Failure to Train

In addition to plaintiff's claims as to policy and custom, plaintiff alleges that the City failed to train its officers "in basic, well-known, and commonly-occurring First Amendment situations…such as leafletting, oppositional speech, and/or loud speech…." ECF 12, ¶ 47. In *Canton*, 489 U.S. at 389, the Supreme Court said that "where a municipality's failure to train its employees in a relevant respect evidences a 'deliberate indifference' to the rights of its inhabitants . . . such a shortcoming [can] be properly thought of as a city 'policy or custom' that is actionable under § 1983."

Indeed, the manner in which a police force chooses to train its officers is "necessarily a matter of 'policy[.]'" *Spell*, 824 F.2d at 1389.   Therefore, "the inadequacy of police training may serve as the basis for § 1983 liability," but "only where the failure to train amounts to deliberate indifference to the rights of persons with whom the police come into contact." *Canton*, 489 U.S. at 388; *see Est. of Jones by Jones v. City of Martinsburg, W. Virginia*, 961 F.3d 661, 671–72 (4th Cir. 2020) ("If the City's failure to train reflects such a deliberate or consciously indifferent 'policy,' then its failure can fairly be said to be the 'moving force [behind] the constitutional violation.'").

When a plaintiff asserts a claim based on inadequate training, the "complaint should contain facts revealing: (1) the nature of the training, (2) that the training was a 'deliberate or conscious' choice by the municipality, and (3) that the officer's conduct resulted from said training." *Lewis v. Simms*, AW-11-CV-2172, 2012 WL 254024, at *3 (D. Md. Jan. 26, 2012) (quoting *Drewry v. Stevenson*, WDQ-09-2340, 2010 WL 93268, at *4 (D. Md. Jan. 6, 2010)), *aff'd*, 582 F. App'x 180 (4th Cir. 2014). "Training policy deficiencies can include (1) 'express authorizations of unconstitutional conduct,' (2) 'tacit authorizations' of such unconstitutional conduct, and (3) failures to adequately 'prohibit or discourage readily foreseeable conduct in light of known exigencies of police duty.'" *Washington v. Balt. Police Dep't*, 457 F. Supp. 3d 520, 533 (D. Md. 2020) (quoting *Spell*, 824 F.2d at 1390).

Notably, even if "a particular officer may be unsatisfactorily trained," that "will not alone suffice to fasten liability on the city, for the officer's shortcomings may have resulted from factors other than a faulty training program." *Canton*, 489 U.S. at 390-91. The *Canton* Court reasoned, *id.* at 391:

> Neither will it suffice to prove that an injury or accident could have been avoided if an officer had had better or more training, sufficient to equip him to avoid the particular injury-causing conduct. Such a claim could be made about almost any encounter resulting in injury, yet not condemn the adequacy of the program to enable officers to respond properly to the usual and recurring situations with which they must deal. And plainly, adequately trained officers occasionally make mistakes; the fact that they do says little about the training program or the legal basis for holding the city liable.

Although the procedural posture of this case distinguishes it from *Connick*, 563 U.S. 51, that case is pertinent, as it highlights the challenge a plaintiff faces when seeking to prevail on a failure to train claim. In *Connick*, the Court reiterated: "[P]rov[ing] that an injury or accident could have been avoided if an [employee] had had better or more training, sufficient to equip

him to avoid the particular injury-causing conduct will not suffice." *Id.* at 68 (alteration in *Connick*) (internal quotations omitted).

In *Connick*, Thompson was convicted of attempted armed robbery and murder. *Id.* at 54. However, his convictions were overturned when it was discovered that the prosecution failed to disclose the existence of a certain crime lab report. *Id.* Based on the violation of *Brady v. Maryland*, 373 U.S. 83 (1963), Thompson filed a § 1983 suit against Harry Connick, in his official capacity as the Orleans Parish District Attorney. 563 U.S. 54. He alleged, *inter alia*, a "deliberate indifference to an obvious need to train prosecutors in his office to avoid such constitutional violations." *Id.* at 57. The district court ruled that, in order to establish deliberate indifference, Thompson was not required to show a pattern of similar *Brady* violations, when he could demonstrate that the need for training was "'so obvious.'" *Id.* at 58. The jury found for Thompson and awarded him damages. *Id.* A divided Fifth Circuit affirmed. *Id.* at 57.

The Supreme Court considered whether the prosecutor's office could be "held liable under § 1983 for failure to train its prosecutors based on a single *Brady* violation." *Id.* at 54. The Court noted that the *Canton* Court "sought not to foreclose the possibility . . . that the unconstitutional consequences of failing to train could be so patently obvious that a city could be liable under § 1983 without proof of a pre-existing pattern of violations." *Id.* at 64. Nevertheless, the Court said, *id.* at 61:

> In limited circumstances, a local government's decision not to train certain employees about their legal duty to avoid violating citizens' rights may rise to the level of an official government policy for purposes of § 1983. A municipality's culpability for a deprivation of rights is at its most tenuous where a claim turns on a failure to train. *See Oklahoma City v. Tuttle*, 471 U.S. 808, 822-823, 105 S.Ct. 2427, 85 L.Ed.2d 791 (1985) (plurality opinion) ("[A] 'policy' of 'inadequate training' "is "far more nebulous, and a good deal further removed from the constitutional violation, than was the policy in *Monell*").

64

The case of *Peters*, 2014 WL 4855032, also provides guidance.  In that case, the plaintiff lodged a § 1983 claim for failure to train the police force.  *Id.* at *5. The complaint stated, *id.* (alteration in *Peters*) (quoting the complaint):

> [T]he City maintained an "official policy" of . . . "fail[ing] to properly train and supervise its officers; fail[ing] to implement effective procedures for investigating allegations of police misconduct; fail[ing] to discipline officers who violate the Constitutional rights of private citizens through false arrests, malicious prosecutions, and brutal conduct; and generally fail[ing] to provide safeguards against Constitutional abuses by its overzealous officers."

In considering whether to dismiss the failure to train claim, Judge Hazel highlighted the complaint's failure to allege facts concerning the "'nature of the training'" or "'that the officer's conduct resulted from said training.'"  *Id.* at *5 (quoting *Lewis*, 2012 WL 254024, at *1).  He noted: "Peters has not even attempted to allege any such facts; instead, he has simply stated in broad, conclusory terms and in a variety of different ways that the City failed to train and supervise its officers."  *Id.* (citation to the record omitted).  Emphasizing this deficiency, Judge Hazel concluded that the plaintiff's allegation was "nothing more than a bare-bones generalization that a legal element (i.e. the policy[-]or-custom element) is met.  Without more, Peters has failed to adequately allege the existence of a policy or custom through the City's purported failure to train its officers." *Id.*

And, *Hall v. Fabrizio*, JKB-12-754, 2012 WL 2905293 (D. Md. July 13, 2012), is also instructive.  There, Judge Bredar dismissed a failure to train claim against the Baltimore Police Department because "the complaint [did] not allege any facts regarding the sort of training that Baltimore police officers actually receive or how that training reflects the decision of any municipal policymaker."  *Id.* at *2; *see also Johnson*, 452 F. Supp. 3d at 309 (finding "lone allegation" regarding department's lesson plan and no causal link with the alleged harm was insufficient to state a plausible failure to train claim).

65

Here, plaintiff alleges that the FPD failed properly to train officers, but he does not identify any particular training practices that were deficient. Nor does he offer any facts to support an inference that the FPD were on notice of any defects in the training program. Rather, Saltz relies solely on conclusory statements, without any particular information about the nature of existing training methods. In view of *Canton*, *Connick*, *Hall*, and *Peters*, among other cases, it is clear that stating a claim for failure to train requires more than bald assertions that police officers were not properly trained. Accordingly, the Amended Complaint's allegations fall short of stating a claim for failure to train. *See Connick*, 563 U.S. at 61 ("A municipality's culpability for a deprivation of rights is at its most tenuous where a claim turns on a failure to train.").

Thus, the portion of Counts 1 and 3 concerning custom and inadequate training shall be dismissed, without prejudice.

### 5. Motion to Bifurcate

Defendants assert that if the *Monell* claims are not dismissed, they should be bifurcated for discovery and trial. ECF 16-1 at 36-37. Plaintiff does not oppose bifurcation, noting that the "weight of authority in this Court favors bifurcation." ECF 21 at 53.

Rule 42(b) provides: "For convenience, to avoid prejudice, or to expedite and economize, the court may order a separate trial of one or more separate issues, claims, crossclaims, counterclaims, or third-party claims." Notably, Rule 42(b) is disjunctive, meaning "[o]nly one of these criteria need be met to justify bifurcation." *Saxion v. Titan-C-Mfg.*, 86 F.3d 553, 556 (6th Cir. 1996) (citations omitted).

District courts have "broad discretion in deciding whether to bifurcate claims for trial, and the exercise of that discretion will be set aside only if clearly abused." *Beasley v. Kelly*, DKC-10- 0049, 2010 WL 3221848, at *3 (D. Md. Aug. 13, 2010) (citing *Dixon v. CSX Transp.,*

*Inc.*, 990 F.2d 1440, 1443 (4th Cir. 1993), *cert. denied*, 510 U.S. 915 (1993)); *see also Shetterly v. Raymark Indus., Inc.*, 117 F.3d 776, 782 (4th Cir. 1997) (decisions whether to bifurcate are reviewed for abuse of discretion); *Brown v. Bailey*, RDB-11-1901, 2012 WL 2188338, at *4 (D. Md. June 13, 2012); *Dawson v. Prince George's Cty.*, 896 F. Supp. 537, 539 (D. Md. 1995); 9A WRIGHT & MILLER, FEDERAL PRACTICE AND PROCEDURE § 2388 (3d ed. 2019) ("It is well-established by a wealth of case law that ultimately the question of whether to conduct separate trials under Rule 42(b) should be, and is, a matter left to the sound discretion of the trial court[.]").

Cases that contain *Monell* claims "are good candidates for bifurcation." *Beasley*, 2010 WL 3221848, at *3. Bifurcation can, in certain circumstances, advance the efficient and convenient resolution of the case because where there is no "initial finding that a government employee violated a plaintiff's constitutional rights, . . . . no subsequent trial of the municipality is necessary." *Id.* In addition, bifurcation might spare the parties from expending valuable resources in discovery, because resolution of the claims as to the individual defendants may obviate the need to litigate the *Monell* claim. *See Burgess v. Baltimore Police Department*, RDB-15-0834, 2016 WL 1159200, at *1 (D. Md. Mar. 23, 2016) (finding bifurcation appropriate "[g]iven the derivative nature of [the police department's] potential liability"); *Taylor v. Maryland*, DKC-10-2167, 2010 WL 5247903, at *2 (D. Md. Dec. 16, 2010) ("Because of the secondary nature of a municipality on potential liability under § 1983, courts have frequently bifurcated discovery and or trial so that cases proceed first with a trial against the individual defendant(s) alleged to be primarily liable[.]" (alteration in original)).

Equally important, bifurcation might prevent the potential prejudice to individual defendants that might result from the introduction of inflammatory evidence concerning the

municipality's policies, practices, or customs.  *Taylor*, 2010 WL 5247903, at *2; *Beasley*, 2010 WL 3221848, at *3.  Although such evidence "is relevant under the *Monell* analysis," it might unfairly bias the jury as to the liability of the individual defendants.  *Beasley*, 2010 WL 3221848, at *3 (observing that the introduction of instances of police misconduct at trial "would be highly prejudicial to the individual government employees").

Judges in this district have repeatedly ruled that bifurcation "is appropriate and often desirable" in cases involving both § 1983 claims against individual police officers and *Monell* claims.  *Brown*, 2012 WL 2188338, at *4; *see also, e.g.*, *Peprah v. Williams*, GLR-18-990, 2019 WL 224245, at *10 (D. Md. Jan. 15, 2019) ("This Court has repeatedly held that bifurcation is appropriate in cases involving § 1983 claims against individual defendants and municipalities."); *accord Peterson v. Prince George's Cty*, PWG-16-1947, 2017 WL 2666109 at *4 (D. Md. June 21, 2017);  *Humbert v. O'Malley*, WDQ-11-0440, 2012 WL 1066478, at *2 (D. Md. Mar. 27, 2012), *rev'd on other grounds*, 866 F.3d 546 (4th Cir. 2017); *James v. Frederick Cty. Pub. Schs.*, 441 F. Supp. 2d 755, 762 (D. Md. 2006); *Robertson v. Prince George's Cty.,* 215 F. Supp. 2d 664, 665 (D. Md. 2002); *Dawson*, 896 F. Supp. at 539; *Marryshow*, 139 F.R.D. at 319. Nevertheless, "'[e]ach case must be considered in light of its particular facts and circumstances.'"  *Noel v. Artson*, WMN-06-2069, 2006 WL 8427663, at *3 (D. Md. Nov. 1, 2006) (quoting *Marryshow*, 139 F.R.D. at 319).

In my view, bifurcation is appropriate because it will promote judicial economy, conserve the parties' resources, and prevent prejudice to the individual defendants. Moreover, both parties agree to bifurcation.

Therefore, I shall grant the motion to bifurcate as to Counts 1 and 3.

## IV.     Conclusion

For the reasons stated above, I shall grant in part and deny in part the Motion. In particular, I shall deny the Motion as to Counts 2 through 4, except to the extent that Counts 2 and 4 allege a claim against Chief Hargis.  I shall grant the Motion as to the *Monell* claims, in part. And, I shall grant the motion to bifurcate. An Order follows, consistent with this Memorandum Opinion.

Date:   May 10, 2021

_____/s/_____
Ellen Lipton Hollander
United States District Judge

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

JASON SALTZ,
*Plaintiff*

      v.                                   Civil Action No. ELH-20-00831

CITY OF FREDERICK, MD., et *al.*,
*Defendants.*

**ORDER**

For the reasons set forth in the accompanying Memorandum Opinion, it is this 10th day

of May, 2021, by the United States District Court for the District of Maryland, **ORDERED**:

1. The Motion (ECF 16-1) is **GRANTED** as to the claims in Counts 2 and 4 against

   Chief Hargis and the claims in Counts 1 and 3 predicated on theories of custom

   and failure to train;

2. The motion to bifurcate is **GRANTED**;

3. The Motion is otherwise **DENIED**;

4. Defendants are directed to answer the suit by May 24, 2021.

                                            _____/s/_____
                                            Ellen Lipton Hollander
                                            United States District Judge